Paul W. Kisslinger
Kyle M. DeYoung
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549-5977
(202) 551-4427 (tel) (Kisslinger)
(202) 772-9292 (fax) (Kisslinger)
*kisslingerp@sec.gov*

Blaine T. Welsh
Assistant United States Attorney
Nevada Bar. No. 4790
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787
*Blaine.Welsh@usdoj.gov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA – LAS VEGAS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DANIEL E. RUETTIGER, ROCCO BRANDONISIO, STEPHEN DECESARE, PAWEL P. DYNKOWSKI, KEVIN S. KAPLAN, GREGG R. MULHOLLAND, MEHMET MUSTAFOGLU, JOSEPH A. PADILLA, ANGELO R. PANETTA, KEVIN J. QUINN, ANDREA M. RITCHIE, CHAD P. SMANJAK, and GARY J. YOCOM,**<br><br>**Defendants.** | Case No.  2:11-cv-2011 |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows against the Defendants named above:

## **SUMMARY OF CASE**

1.      The misconduct at the heart of this case is a classic pump-and-dump scheme involving a penny stock called Rudy Nutrition ("RUNU"). Daniel "Rudy" Ruettiger -- the walk-on football player at Notre Dame who was the subject of the 1993 movie "Rudy" -- founded RUNU to compete with Gatorade® in the sports drink market. Although RUNU produced, marketed, and sold a sports drink in modest quantities, it primarily served as a vehicle for a pump-and-dump scheme that occurred between February and September 2008 and grossed over $11 million for the participants in the fraudulent scheme.

2.      A stock promoter named Stephen DeCesare put the RUNU scheme together. He helped officers of RUNU, including Ruettiger (the CEO), Rocco "Rocky" Brandonisio (the President), and Kevin Kaplan (the CFO), engage in a public distribution of RUNU stock.

3.      Toward that end, DeCesare, Ruettiger and others arranged for the stock of RUNU to be publicly traded through the use of a shell company. DeCesare then organized the efforts to pump RUNU's stock, which included partnering with people such as Defendants Gregg Mulholland, Pawel Dynkowski, Chad Smanjak, and others to inflate the price and volume of the stock artificially through fraudulent touting and manipulative trading. The scheme participants made and distributed a series of false or misleading statements about RUNU to the public in furtherance of the fraud. These statements appeared in mailers sent to millions of investors in the United States, in messages posted in internet chat rooms dedicated to penny stocks, in videos placed on a website accessible to the general public, in press releases that RUNU issued to the public, and in Forms 8-K and 10-K that RUNU filed with the Commission.

4.      DeCesare and a disbarred California lawyer named Kevin Quinn arranged for three billion RUNU shares to be issued to nominee entities, which sold almost one billion shares to unsuspecting investors in the public market during the scheme.

5.      The foregoing conduct violated Sections 5(a), 5(c), 17(a), and 17(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a) & 77 q(b)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.      The Commission seeks to have the Court enter judgments permanently enjoining Defendants from violating the securities laws, requiring the payment of disgorgement, prejudgment interest, and civil monetary penalties, and barring certain of the Defendants from participating in future penny stock offerings or serving as officers or directors of publicly traded companies.

7.      Each of the Defendants will continue to violate the securities laws unless permanently restrained and enjoined from doing so.

**JURISDICTION**

8.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

9.      The U.S. District Court for the District of Nevada – Las Vegas is a proper venue for this action because certain of the acts and transactions at issue in this action occurred in this District.  For example, RUNU is a company organized and existing under the laws of Nevada, and its primary operations were in Las Vegas.  RUNU's CEO (Ruettiger), President (Brandonisio), and CFO (Kaplan) each lived in Las Vegas during the relevant time period.  Each

of these individuals, in their capacity as members of RUNU's board of directors, signed

resolutions in Las Vegas that caused RUNU to issue stock that certain defendants subsequently

sold to the public as part of the fraudulent manipulation scheme described below.  Similarly,

RUNU issued all of the false press releases described below from Las Vegas.

10.     Defendants, directly or indirectly, made use of the means and instrumentalities of

interstate commerce, the means and instruments of transportation and communications in

interstate commerce, and the mails in connection with the acts, practices, and courses of conduct

alleged herein.

## DEFENDANTS

11.     Defendant **Daniel E. Ruettiger (a.k.a. Rudy Ruettiger)** is a resident of Las

Vegas, Nevada.  Ruettiger was the CEO and Secretary of RUNU as well as a Director during the

relevant time period.

12.     Defendant **Rocco Brandonisio (a.k.a. Rocky Brandonisio)** is a resident of Las

Vegas, Nevada.  Brandonisio was the President of RUNU and a Director during the relevant time

period.

13.     Defendant **Kevin S. Kaplan** is a resident of Las Vegas, Nevada.  Kaplan was the

Chief Financial Officer ("CFO") of RUNU and a Director until September 2008.

14.     Defendant **Stephen DeCesare** is a resident of Las Vegas, Nevada.  DeCesare was

a stock promoter who promoted RUNU during the relevant time period.

15.     Defendant **Kevin J. Quinn** is a resident of Santa Monica, California.  Quinn is a

disbarred California lawyer who, at the direction of DeCesare, arranged for RUNU to issue

billions of shares of purportedly unrestricted stock[1] during the relevant time period.

16.     Defendant **Gregg R. Mulholland** is a resident of Huntington Beach, California. Mulholland was a stock promoter who promoted RUNU during the relevant time period.

17.     Defendant **Joseph A. Padilla** is a resident of San Marcos, California. Padilla was a registered representative at Scottsdale Capital Advisors LLC, the registered broker-dealer that handled certain accounts of Mulholland, DeCesare, Quinn, and others that sold RUNU stock in the scheme.

18.     Defendant **Chad P. Smanjak** is a citizen of the Republic of South Africa and was a resident of Los Angeles, California during 2008. Smanjak was a stock promoter who promoted RUNU during the relevant time period.

19.     Defendant **Pawel P. Dynkowski** is a citizen of Poland and a legal resident of the U.S. During the relevant time period, Dynkowski resided in Laguna Beach, California.

20.     Defendant **Angelo R. Panetta** is a resident of Montebello, California. Panetta was a stock promoter who promoted RUNU during the relevant time period.

21.     Defendant **Andrea M. Ritchie** is a resident of San Marcos, California. Ritchie was the registered representative at Scottsdale Capital Advisors LLC who sold RUNU stock on behalf of Mulholland, DeCesare, Quinn and others during the scheme.

22.     Defendant **Gary J. Yocom** is a resident of Altamonte Springs, Florida. Yocom was the registered representative at Thomas Anthony & Associates, Inc. who sold RUNU stock on behalf of Smanjak, Dynkowski, DeCesare and others during the second phase of the scheme.

23.     Defendant **Mehmet Mustafoglu (a.k.a. Mike Mustafoglu)** is a resident of

---

[1] All of the stock issued by RUNU in this matter was legally restricted, even if the company did not attach restrictive legends to the certificates. For that reason, the Commission uses the terms "purportedly unrestricted" or "legend-less" to describe shares of stock that the company itself described as "free trading."

Beverly Hills, California who performed certain consulting services for RUNU. Mustafoglu agreed with DeCesare to receive RUNU stock and split the proceeds of selling it with DeCesare.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

24.     **Rudy Nutrition** ("RUNU") was a Nevada company based in Las Vegas. RUNU marketed and sold a line of sports drinks. Its common stock was registered with the Commission pursuant to Exchange Act Section 12(g) [15 U.S.C. § 78l(g)]. It was quoted on the Pink Sheets (formally known as the OTC Markets Group, Inc.) under the symbol "RUNU" until September 12, 2008, when the Commission suspended trading in the security. *See* S.E.C. Exch. Act Rel. No. 58526 (Sept. 12, 2008). The Commission revoked the registration of RUNU's securities on November 14, 2008 because the company was delinquent in making its periodic filings. *See Order Making Findings and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934 as to Rudy Nutrition*, S.E.C. Exch. Act Rel. No. 58947 (Nov. 14, 2008). RUNU became defunct shortly thereafter.

25.     **Rudy Beverage Inc.** ("Beverage") was a private Nevada corporation that on February 11, 2008 became publicly traded after a reverse merger into a shell company named AccuPoll Holding Corp. The merged entity was named Rudy Nutrition. Prior to the merger, Ruettiger was a director of Beverage and Brandonisio was the President, Secretary and Treasurer. Ruettiger and Brandonisio (as well as others) jointly owned Beverage through a partnership called Rudy Partners, Ltd.

26.     **AccuPoll Holding Corp.** ("AccuPoll") was a Nevada shell corporation that Rudy Beverage, Inc. acquired in a reverse merger and renamed Rudy Nutrition on February 11, 2008. AccuPoll was quoted on the Pink Sheets at the time of the merger.

27.     **Scottsdale Capital Advisors LLC** is a registered broker-dealer located in

Scottsdale, Arizona and, during the relevant time period, Carlsbad, California.

28.     **Thomas Anthony & Associates, Inc.** ("Thomas Anthony") was a registered broker-dealer located in Winter Park, Florida.  Thomas Anthony ceased doing business in December 2008.

29.     **Global Media Partners, Inc.** is a Nevada corporation that is owned and controlled by Mulholland and Padilla.  Mulholland is the company's President, Secretary and Treasurer (according to the website of the Nevada Secretary of State).  Padilla opened and controlled the Global Media Partners brokerage account at Thomas Anthony that sold RUNU shares in the scheme.  On the account application, Padilla stated that he was the "President" of Global Media Partners and the "sole owner."

30.     **Joseph A. Saranello** is a resident of Silverthorne, Colorado.  Saranello is a disbarred Texas lawyer who arranged for Smanjak to control a series of Panamanian corporations that obtained and then sold RUNU stock in the scheme.

## FACTS

### Background on Rudy Beverage, Inc.

31.     The RUNU pump-and-dump scheme occurred in two rounds in 2008:  February to April, and May to September.  The scheme amassed illicit profits of more than $11 million.

32.     Rudy Beverage, Inc. ("Beverage") was a Nevada corporation that purportedly competed in the national sports drink market, with such titans as Gatorade® and vitaminwater®.  The namesake of Beverage and its principal founder was Daniel "Rudy" Ruettiger, the Notre Dame football player depicted in the 1993 film "Rudy."  Beverage allegedly marketed and sold a sports drink called "Rudy" with the tag line "Dream Big! Never Quit!"

33.     Ruettiger was the CEO of Beverage.  He and Joseph Agostino, one of his friends from Notre Dame, ran Beverage out of South Bend, Indiana until October 2007, when Rocky

7

Brandonisio became the company's President.  Brandonisio moved the company's operations to Las Vegas (where he and Ruettiger live) and took over as the day-to-day business manager. During this time, Beverage struggled financially, with few customers, few assets and no profits.

### Stephen DeCesare Helped the Management of Rudy Beverage Lay the Groundwork for the Scheme

34.     Stephen DeCesare became the primary organizer for the resulting pump-and-dump scheme involving RUNU stock starting in late 2007.  Ruettiger knew DeCesare from previous business dealings and they were neighbors in Las Vegas.  DeCesare was an experienced penny stock promoter.  Ruettiger and Brandonisio gave DeCesare sufficient control of RUNU to facilitate the scheme.

35.     DeCesare's first task was to turn Beverage into a publicly traded company.  He identified a shell corporation quoted on the Pink Sheets into which Beverage could be merged. The shell was AccuPoll Holding Corporation ("AccuPoll").  DeCesare picked AccuPoll because the shell had a mechanism for creating vast quantities of purportedly unrestricted stock through the use of a convertible note.

36.     DeCesare tasked Kevin Quinn with executing the merger and working with the company's transfer agent to issue purportedly unrestricted stock.  On February 11, 2008, Beverage acquired AccuPoll in a reverse merger and then changed its name to "Rudy Nutrition." A reverse merger occurs when a private company acquires a public company (typically a shell company) in order to become publicly-traded.

37.     Quinn prepared a Form 8-K that described the merger and filed it with the Commission on February 15, 2008.  The reverse merger resulted in an entity called Rudy Partners, Ltd. holding 94.9% of RUNU's stock.  Ruettiger owned 2.45% of RUNU stock and 43.23% of Rudy Partners.

38.     Ruettiger authorized his signature to be placed electronically on the Form 8-K filing dated February 15, 2008. Rudy Nutrition began to be quoted on the Pink Sheets on February 21, 2008 under the ticker symbol RUNU.

39.     Ruettiger was the CEO, Secretary and a Director of RUNU. Brandonisio was the President and a Director of RUNU. Kevin Kaplan, an acquaintance of Ruettiger, became the Chief Financial Officer and a Director of RUNU.

### The Mechanism for Issuing Billions of Purportedly Unrestricted Shares of RUNU Stock

40.     A pump-and-dump scheme normally requires that its organizers control large quantities of purportedly unrestricted shares of the target company's common stock. The RUNU fraud was no exception, a point that DeCesare and Quinn understood well.

41.     DeCesare put Quinn in charge of generating that stock for RUNU. In that role, Quinn acted as the primary liaison between RUNU and its transfer agent in Plano, Texas. DeCesare and Gregg Mulholland provided Quinn with the names of the individuals and entities that were supposed to receive and sell the stock during the scheme.

42.     Quinn persuaded the transfer agent to issue RUNU stock in unrestricted form by claiming that the recipients were exercising assignments of a convertible note older than the holding period under Commission Rule 144 [17 C.F.R. § 230.144].

43.     Specifically, Quinn told the transfer agent that: (1) the company had issued the convertible note in the past to an individual associated with AccuPoll Holding Corp.; (2) that individual had assigned portions of the note to a series of entities and individuals associated with DeCesare and Mulholland ("the assignees"); (3) the assignees had exercised their assigned portions of the note to obtain the stock of RUNU; (4) the note was more than a year old; and (5) the assigned portions of the note should be converted into unrestricted stock because the relevant

9

holding period under Rule 144 had elapsed.

44.     This explanation that Quinn provided to the transfer agent for RUNU was a sham designed to evade the registration requirements of the federal securities laws.

45.     For each new issuance of stock, Quinn sent the transfer agent an authorizing resolution of RUNU's board of directors.  The resolutions each bore the signatures of Ruettiger, Brandonisio, and Kaplan.  The directors personally signed these resolutions early in the scheme, but later Quinn affixed a photocopy of their signatures to the resolutions.

46.     Ruettiger, Brandonisio, Kaplan, DeCesare, and Quinn knew or were reckless in not knowing that the purpose of RUNU issuing such stock was to distribute it into the public market in violation of the federal securities laws.

47.     Using the foregoing mechanism, RUNU issued more than 3 billion shares of purportedly unrestricted common stock between February and September 2008.  In fact, the company issued so much stock that it had to increase its maximum number of authorized shares (first to a billion shares and then to five billion shares).

48.     The scheme occurred in two rounds in 2008.  The first round occurred in February to April and the second round occurred in May to September.

49.     As described below, in the first round, RUNU issued 42 million shares to entities owned by, controlled by and/or associated with Mehmet Mustafoglu (7.5 million shares), Quinn (12.75 million shares), Mulholland (17.1 million shares) and Joseph Padilla (2.85 million shares), as well as others.  Mulholland knew or was reckless in not knowing that the purpose of RUNU issuing such stock was to distribute it into the public market in violation of the federal securities laws.

50.     Mustafoglu had agreed to give DeCesare half of the proceeds from selling the

RUNU shares in Mustafoglu's accounts.  Mustafoglu executed a power of attorney to allow

Quinn to place sell orders for one of the accounts that Mustafoglu controlled.

51.     Most of the shares for Mulholland and Padilla went to entities that they owned or

controlled:

| Entity | Owner | RUNU Shares Received |
|---|---|---|
| Bruin Industries Inc. | Mulholland | 2,857,143 |
| Global Media Partners Inc. | Padilla | 2,857,142 |
| Griffin Trading Co. | Mulholland | 2,857,143 |
| Serrisan Investment Holdings Inc. | Mulholland | 2,857,143 |

52.     Mulholland also directed that some of the shares be issued to entities controlled

by certain associates.

53.     Almost all of the individuals and entities receiving the RUNU stock in the first

phase had an account at Scottsdale Capital Advisors LLC, which was the registered broker-

dealer that subsequently sold the stock.  Andrea Ritchie was the registered representative at

Scottsdale who handled the deposit and sale of these shares.  In doing so, she failed to conduct a

reasonable inquiry into the registration status of the RUNU shares.

54.     Padilla had an account in the name of Global Media Partners, Inc. at Thomas

Anthony & Associates Inc., which was the registered broker-dealer that handled the dump

accounts in the second phase of the scheme (described below).

55.     In the second round of the scheme, most of the stock went to the following sixteen

nominee entities controlled by Chad Smanjak who was engaged to manipulate RUNU's shares

starting in May 2008:

| Entity | Shares Issued |
|---|---|
| Adripaul, Inc. | 7,400,000 |
| Battle X, Inc. | 185,622,725 |
| Carlton Rowe, Inc. | 210,622,709 |
| Cordillera Capital Group, Inc. | 193,956,043 |

| Entity | Shares Issued |
|---|---|
| Fairplay International Enterprises LLC | 50,000,000 |
| Falcon Real Estate Holdings, Inc. | 185,622,709 |
| Golden Jubilee Ventures, Inc. | 210,622,709 |
| Graysia Partners, Inc. | 210,622,709 |
| HiJinks Productions, Inc. | 2,300,000 |
| Independent Investors Group, Inc. | 210,622,709 |
| Pan American Capital Group, Inc. | 60,622,709 |
| Panama Investor Services, Inc. | 182,051,281 |
| Prime Travel Protection, Inc. | 210,622,709 |
| Stargate International, Inc. | 193,956,043 |
| Synergy Property Group, Inc. | 210,622,714 |
| XAX International Group, Inc. | 210,622,709 |
| **Total** | 2,535,890,478 |

56.     These entities were all Panamanian corporations, and their owners were ostensibly Panamanian nationals.  In reality, Joseph Saranello, one of Smanjak's associates, set up these companies and gave control of them to Smanjak.

57.     Smanjak directed Saranello to open brokerage and bank accounts in the name of these entities.

58.     Saranello used a group called Panama Offshore Legal Services ("POLS"), which is based in Panama, to incorporate these entities.  POLS enabled Saranello secretly to direct the actions of the entities, which he did according to the instructions of Smanjak.

59.     For example, when Saranello needed documents (such as brokerage account applications) signed by the alleged Panamanian owners of the entities, POLS obtained the necessary signatures.  POLS also provided photocopies of the alleged owners' passports, which Saranello supplied to various broker-dealers in the context of opening brokerage accounts.

60.     Smanjak's purpose in using these entities to receive and then sell the stock of RUNU was to prevent clearing firms and governmental authorities from knowing that he was

responsible for all of the resulting selling. Smanjak also used the entities to launder the proceeds of the fraud.

61. RUNU issued additional shares to entities controlled by DeCesare and Quinn in the second round of the scheme.

62. At Smanjak's direction, Saranello opened brokerage accounts for each of the Panamanian entities at Thomas Anthony, a now defunct four-person broker-dealer in Winter Park, Florida.

63. Gary Yocom, a registered representative at Thomas Anthony, worked with Saranello to open these accounts. Yocom helped Saranello and Smanjak deposit large amounts of RUNU stock in certificate form in the accounts of the entities. Yocom subsequently sold hundreds of millions of shares in the market at the direction of Dynkowski, Smanjak, and Saranello. In doing so, he failed to conduct a reasonable inquiry into the registration status of the RUNU shares.

64. DeCesare, Mulholland, Smanjak, Dynkowski, and Saranello obtained the newly-issued RUNU stock described above and used it to conduct a scheme that they knew or were reckless in not knowing was fraudulent.

**Round One of the RUNU Scheme: February – April 2008**

65. DeCesare initially chose Gregg Mulholland to pump RUNU's stock. DeCesare had met Mulholland in late 2007 through Joseph Padilla. Mulholland and Padilla worked under the auspices of a company they owned together called Global Media Partners, Inc.

66. In exchange for 20 million shares of purportedly unrestricted RUNU stock, Mulholland agreed to pump RUNU through a direct mail campaign, an email campaign, and videos posted on the internet. In coordination with Mulholland's efforts, DeCesare helped to

pump the stock by directing the false company press releases through a small public relations firm.

67.     Mulholland initiated the pump of RUNU starting in March 2008.  With assistance provided by DeCesare and the company's officers and directors, Mulholland sent out two different glossy mailers touting RUNU to more than 2 million U.S. households, neither of which adequately disclosed his compensation for doing so.

68.     The mailers stated that one of the entities controlled by Mulholland, Bruin Industries Inc., received 2,857,200 shares of legend-less RUNU stock.  The mailers did not disclose that other entities owned or controlled by Mulholland (and his associates, Individuals A and B) received more than 17 million additional shares of RUNU stock or that the stock came directly from the issuer.

69.     The mailers told prospective investors that RUNU had "partnership agreements" with two large soft drink distributors:  Canteen Franchise Group and Vistar Corporation, a subsidiary of Performance Food Group Co.  These were materially false statements.

70.     Vistar and Canteen did not have any agreements with RUNU.  At most, units of Vistar and Canteen had purchased a small amount of RUNU's products; they had not entered into any partnership agreements with RUNU.

71.     Mulholland knew or was reckless in not knowing that the statements about Canteen and Vistar in the mailers were false.

72.     During March 2008, RUNU also issued press releases about the supposed agreements with Canteen and Vistar with such headlines as "Rudy Nutrition Signs National Vending Distribution Agreement with Vistar Corporation" and "Rudy Nutrition Kicks Off Spring 2008 With Distribution via the Largest National Vending Franchise Group" (i.e.,

Canteen).  The press releases were materially false.  Indeed, representatives of Canteen and

Vistar contacted Brandonisio to tell him that each of the respective press releases were false.

73.     Ruettiger, Brandonisio, DeCesare, and Quinn knew or were reckless in not

knowing that the statements about Canteen and Vistar in the press releases were materially false.

74.     RUNU repeated the false or misleading claim that it had signed a "national

distribution agreement" with Vistar in its Forms 8-K and 10-K filed with the Commission

respectively on February 15 and October 14, 2008.  Defendants Ruettiger and Brandonisio

signed the Form 10-K, and Ruettiger signed the Form 8-K.  They knew or were reckless in not

knowing that no such agreement with Vistar existed.

75.     Mulholland commissioned a resident of the United Kingdom to tout RUNU in

emails sent in February, March, and May 2008 to investors who had subscribed to an internet

newsletter called DoublingStocks.com.  The emails expanded upon the false or misleading

statements from the mailers.  For example, the mailers claimed that "[i]n a major southwest test,

Rudy outsold Gatorade® 2 to 1!"  The emails turned that claim into: "[i]n several blind taste

tests, Rudy outperformed Gatorade® and Powerade® by 2:1."  These statements were materially

false or misleading.

76.     Mulholland also filmed two Internet videos purporting to provide investment

advice on a web site called PirateStockTV.com.  Mulholland personally appeared in the videos

and his advice for viewers was to purchase RUNU stock.  He also made at least one false

statement about RUNU in the videos when he reiterated the claim about the Rudy drink beating

Gatorade in taste tests.  In none of these videos did he disclose that he was being paid to promote

the stock of RUNU.

77.     Mulholland's efforts, combined with the company press releases, had the

predictable effect of attracting buyers to the stock of RUNU.  In less than a month, RUNU went

from trading 720 shares on February 27, 2008 to trading more than 3,000,000 shares on March

24, 2008.  The price of RUNU also climbed from 25 cents per share on February 28, 2008 to

$1.05 per share by March 12, 2008.

78.     After that point, the price of RUNU began a roller coaster ride as the members of

the scheme sold millions of RUNU shares on the market amid their simultaneous efforts to pump

the stock.

79.     By the end of April 2008, Mulholland, DeCesare (via Mustafoglu), Quinn and a

related person had grossed a total of $2,657,807 from sales of RUNU stock in the various dump

accounts.  Specifically, Mulholland sold approximately $1,707,704 of RUNU stock.  One of

Mulholland's associates to whom Mulholland directed RUNU to issue legend-less stock had

proceeds of $705,227.  DeCesare and Quinn sold $218,625 and $26,251 of RUNU stock,

respectively.  In selling this RUNU stock as part of the scheme, DeCesare, Quinn and

Mulholland knew or should have known that they were participating in a fraudulent pump-and-

dump scheme.

80.     DeCesare received approximately $200,000 from the proceeds of RUNU stock

sales in accounts that Mustafoglu controlled.  DeCesare also sold $18,625 of RUNU stock in an

account held in the name of his girlfriend.

81.     Andrea Ritchie, a registered representative at Scottsdale Capital who was a close

friend of Padilla, executed the sales in RUNU stock by DeCesare, Mulholland, and Quinn in the

first phase of the scheme.  She received $37,666 in commissions from these sales.

82.     RUNU filed three Forms 8-K with the Commission between February and April

2008, and none of them disclosed that RUNU had issued millions of shares of legend-less stock

to Mulholland, DeCesare, Quinn, and others, who promptly sold most of it. Ruettiger signed each of these forms.

83.     RUNU finally disclosed its earlier issuance of 28.5 million shares in a Form 10-Q (signed by Ruettiger) on May 16, 2008. That form conspicuously did not mention that RUNU had issued the 28.5 million shares without restrictive legend.

84.     Ruettiger, Brandonisio, and Kaplan knew or were reckless in not knowing that RUNU had made material omissions in its filings with the Commission by not reporting the issuances of RUNU stock to entities controlled by Mulholland, Padilla, DeCesare, and Quinn between February and April 2008.

85.     By all relevant measures, phase one of the scheme had been a success, and yet DeCesare and the management of RUNU were upset because they had expected the scheme to provide "funding" to keep RUNU going, but it failed to do so. RUNU was mostly out of cash and running on fumes. DeCesare needed to find another source of operating capital for RUNU or it would have gone out of business. It was during his search for funding that he met Chad Smanjak and Pawel Dynkowski, and the second phase of the scheme began.

### Round Two of the RUNU Scheme:  May – September 2008

86.     In late April 2008, DeCesare approached Dynkowski and Smanjak about taking over the RUNU scheme. They were interested. Dynkowski and Smanjak had the right skills and connections to continue the RUNU scheme. Smanjak controlled a series of nominee Panamanian entities (described above) that were ideal for dumping the RUNU stock and laundering the proceeds of the fraud. Dynkowski was an experienced trader whom the Commission had sued in Delaware in 2009 for his role in four different pump-and-dump schemes.

87.     Pawel Dynkowski and Chad Smanjak took over for Mulholland in May 2008.

88.     DeCesare told Dynkowski and Smanjak that they would need to put capital into RUNU to keep it alive.  Ruettiger and Brandonisio wanted $800,000.  While Smanjak and Dynkowski were not willing to pay RUNU before the second phase of the scheme began, they agreed to pay the company from the proceeds of the first set of stock sales by Smanjak's dump accounts.

89.     With that agreement between the parties, RUNU began issuing tens of millions of shares of purportedly unrestricted stock to the accounts of Smanjak's Panamanian entities at Thomas Anthony on May 8, 2008.  RUNU's Form 10-Q, filed with the Commission on May 16, 2008, did not disclose the stock issued to Smanjak's entities.  In fact, RUNU did not fully disclose the issuances to Smanjak's entities until November 2008, when the company filed a Form 10-Q on the day that the Commission revoked the registration of RUNU's securities.

90.     Smanjak sent RUNU $797,500 on June 18 and 20, 2008 in the form of three wire transfers from two Panamanian entities he controlled.  The money was from sales of RUNU stock that Smanjak and Dynkowski directed via the Panamanian entities in May 2008, which is described in more detail below.

91.     To enable these sales to occur, Smanjak and Dynkowski, on behalf of RUNU and DeCesare, began manipulating RUNU's stock on May 19, 2008 through wash sales, matched orders, and trading coordinated with false press releases to fool investors into believing that there was genuine demand for the stock.

92.     Dynkowski used accounts held in the names of other people or entities to conceal his involvement.  Smanjak provided the capital and personally opened at least one of the accounts that Dynkowski used to make these trades.  Smanjak generally directed Dynkowski's manipulative trading.

18

93.     Dynkowski also worked with another member of the scheme, Angelo Panetta, who allowed his brokerage account to be used to manipulate RUNU's stock. Panetta also made false statements about RUNU stock on an internet radio show and in an internet chat room in coordination with Dynkowski's manipulative trading.

94.     In Dynkowski's first week of trading RUNU (May 19 – 23, 2008), the stock's volume went through the roof. The stock traded 42% more shares in those five days than it had during all of February, March, and April, when Mulholland was running the first campaign to pump RUNU.

95.     The next week, Dynkowski demanded that RUNU issue a phony press release to aid his efforts. DeCesare and Quinn arranged for the company to do so on May 29, 2008, when it falsely told the world that it had received an $800,000 private placement from a bogus Panamanian company at almost five times the previous day's closing price for RUNU shares. The press release stated that RUNU intended to use the money to fund its marketing campaign.

96.     In reality, the money (which was actually in the amount of $797,500) was the payment from Dynkowski and Smanjak, described above, which they generated from the sales of unregistered shares of RUNU stock through the Panamanian entities. RUNU used most of the money to pay off outstanding debts, including $85,750 allegedly owed to Ruettiger.

97.     Ruettiger, Brandonisio, DeCesare, Dynkowski, Kaplan, and Quinn knew or were reckless in not knowing that the May 29, 2008 press release was false and misleading.

98.     RUNU stock responded on the day of the May 29, 2008 press release with its highest daily volume to date, and that week the stock saw a 40% jump in aggregate volume over the previous week. DeCesare arranged for Dynkowski to coordinate his manipulative trading with the issuance of the press release.

99.     Dynkowski consistently manipulated RUNU's stock between May 19 and August 12, 2008 to persuade the public to buy more than 700 million RUNU shares sold from dump accounts that he and Smanjak personally controlled.

100.    To accommodate Dynkowski and Smanjak's need for large quantities of newly issued (and unregistered) shares of RUNU stock, the company raised its authorized shares to 1 billion (requested on June 1, 2008 and effective July 23, 2008) and then 5 billion (requested on August 1, 2008 and effective on September 3, 2008).  To do so, Quinn prepared and filed forms with the Nevada Secretary of State's office that Ruettiger and Brandonisio signed as officers of RUNU.

101.    The company did not file a Form 8-K disclosing the increases in its authorized shares (RUNU finally revealed them months later in a delinquent Form 10-K filed after the Commission suspended trading in its stock).

102.    The second phase of the scheme involved such intense pumping and dumping of RUNU stock that its participants accounted for at least 40% of the volume on almost half of the trading days during this period.  Dynkowski and others in the scheme employed hundreds of wash sales and matched orders, and the scheme generated more than $100,000 a day in trading profits on twenty different trading days.  At the same time, the scheme eventually drove the RUNU stock price down to less than $0.002.

103.    This round of the scheme generated more than $6.3 million of illicit profits in slightly less than three months.  The accounts of Smanjak's Panamanian entities grossed slightly more than $6 million from selling RUNU stock.  Panetta and DeCesare made $175,000 and $172,741, respectively, from sales during the second phase of the scheme.

104.    Gary Yocom, the registered representative at Thomas Anthony who handled

these sales, failed to conduct reasonable inquiries about the registration status of the stock before he sold it for Smanjak.

105.    The scheme eventually ended when the Commission issued a trading suspension against RUNU on September 11, 2008 (for delinquent periodic filings).

106.    Smanjak's Panamanian entities had run out of RUNU stock to sell in August 2008.  Only a few days before the trading suspension, Quinn, DeCesare, Smanjak and others had arranged for RUNU to issue another two *billion* shares to Smanjak's Panamanian entities, which they planned to dump on the market at the end of September 2008.  They were unable to do so because of the Commission's trading suspension.

107.    On October 14, 2008, Ruettiger and Brandonisio tried to revive RUNU by filing the company's first Form 10-K with the Commission (Kaplan had resigned his position during the previous month).  Both Ruettiger and Brandonisio signed the filing, which failed to disclose more than 235 million shares of stock that RUNU had issued to entities associated with Smanjak, DeCesare, Quinn, and Panetta between April and June 2008.  Moreover, the Form 10-K did not disclose that all of the stock issued to Smanjak's entities was legend-less.

108.    For the period April 1 to June 30, 2008, the Form 10-K stated:  "We issued 74,087,650 shares in exchange for convertible notes payable and accrued interest in the total amount of $592,701.  All of the shares issued were sold pursuant to an exemption from registration under Section 4(2) promulgated under the Securities Act of 1933, as amended."

109.    This was a false statement.  In reality, RUNU issued 301 million shares of purportedly unrestricted stock during this period to third parties (mostly to Smanjak's entities).  Ruettiger and Brandonisio knew or were reckless in not knowing that RUNU had made a material misstatement in its filing with the Commission.

110.    It was not until November 14, 2008 that RUNU finally disclosed in a Form 10-Q that it had issued more than 2 billion shares of stock during the period July 1 to September 30, 2008.  On that same day, the Commission revoked the registration of RUNU's securities under Section 12(j) of the Exchange Act [15 U.S.C. § 78l(j)], and they ceased to be quoted or traded. RUNU subsequently went out of business.

111.    Like the Form 10-K, the Form 10-Q filed on November 14, 2008 described the more than 2 billion shares issued by RUNU as merely unregistered.  The Form 10-Q did not disclose that RUNU had issued the stock in purportedly unrestricted form.  Ruettiger signed the Form 10-Q.

112.    Thomas Anthony, the broker-dealer servicing the dump accounts in the second phase of the scheme, wired all of the fraudulent proceeds to banks in Panama.

113.    DeCesare received $1.2 million of this money, from which he paid Quinn (approximately $200,000) and Ruettiger ($50,000).  DeCesare's total illicit proceeds from both rounds of the scheme were $1,341,366.

114.    Quinn generated $21,035 from selling RUNU in his own account during the second phase of the scheme, and he separately paid Ruettiger $50,000.  Quinn's total illicit proceeds from both rounds of the scheme were $197,286.

115.    Panetta received $175,000 from selling RUNU stock.

116.    After paying RUNU $797,500, Dynkowski and Smanjak shared the remaining amount of approximately $4.2 million.

117.    In phase two of the scheme, Smanjak, Dynkowski, DeCesare, Quinn, and Panetta knew or were reckless in not knowing that they were participating in a fraudulent pump-and-dump scheme.

118.    Even though Dynkowski and Smanjak had taken over the scheme, Mulholland and Padilla continued selling RUNU shares through the end of June 2008.  Padilla, for example, grossed $197,427 from sales in the Global Media Partners account at Thomas Anthony. Mulhollland grossed $671,747 from additional sales of RUNU stock during this period. Mulholland's total proceeds from all sales in the scheme were $2,379,451.  Mulholland knew or was reckless in not knowing that he was selling shares as part of an on-going pump-and-dump scheme.

## **FIRST CLAIM**

### **Violations of Section 17(a) of the Securities Act**

**(Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak)**

119.    Paragraphs 1 – 118 are hereby incorporated by reference.

120.    Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak knowingly or recklessly, directly or indirectly, in the offer and sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or by the use of the mails:

    a.  employed devices, schemes or artifices to defraud;

    b.  obtained money or property by means of any untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; and/or

    c.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

121.    By engaging in the foregoing conduct, Defendants Brandonisio, DeCesare,

Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

**(Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak)**

122.    Paragraphs 1 – 121 are hereby incorporated by reference.

123.    Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange:

    a.    employed devices, schemes or artifices to defraud;

    b.    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; and/or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

124.    By engaging in the foregoing conduct, Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM

### Violations of Sections 5(a) and (c) of the Securities Act

**(Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Mustafoglu, Padilla, Panetta, Quinn, Ritchie, Ruettiger, Smanjak, and Yocom)**

125.    Paragraphs 1 – 124 are hereby incorporated by reference.

126.    As described above, Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Mustafoglu, Padilla, Panetta, Quinn, Ritchie, Ruettiger, Smanjak, and Yocom directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) without a registration statement in effect as to the securities, sold such securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried such securities for the purpose of sale or for delivery after sale; or (b) offered to sell or offered to buy through the use or medium of a prospectus or otherwise securities as to which a registration statement had not been filed.

127.    By engaging in the conduct described above, Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Mustafoglu, Padilla, Panetta, Quinn, Ritchie, Ruettiger, Smanjak and Yocom violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

## FOURTH CLAIM

### Violations of Securities Act Section 17(b)

### (Defendant Mulholland)

128.    Paragraphs 1 – 127 are hereby incorporated by reference.

129.    As described above, Defendant Mulholland, by use of means or instrumentalities of interstate commerce or of the mails, gave publicity to a security for consideration received, directly or indirectly, from an issuer, without fully disclosing the receipt of such consideration

and the amount thereof.

130.    By reason of the activities described herein, Defendant Mulholland violated and, unless restrained and enjoined, will continue to violate Section 17(b) of the Securities Act (15 U.S.C. § 77q(b)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

a)   permanently enjoin Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Panetta, Quinn, Ruettiger, and Smanjak from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)];

b)   permanently enjoin Defendant Mulholland from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Sections 5(a), 5(c), 17(a), and 17(b) [15 U.S.C. §§ 77e(a), 77e(c), 77q(a) & 77q(b)];

c)   permanently enjoin Defendants Mustafoglu, Padilla, Ritchie and Yocom from engaging in future conduct in violation of Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) & (c)];

d)   order Defendants DeCesare, Mustafoglu, Mulholland, Padilla, Panetta, Quinn, Ritchie, Ruettiger, and Yocom to disgorge, with prejudgment interest, any ill-gotten gains;

e)   order Defendants Dynkowski and Smanjak to disgorge, with prejudgment interest and on a joint and several basis, any ill-gotten gains;

f)   order Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Quinn, Ruettiger, and Smanjak to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

g)   order Defendants Mustafoglu, Padilla, Ritchie and Yocom to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

h)   prohibit Defendants Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Panetta, Ruettiger, and Smanjak from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

i)   prohibit Defendants Mustafoglu, Padilla, Ritchie and Yocom from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)];

j)   prohibit Defendants Brandonisio, Kaplan and Ruettiger, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

k)   grant such other relief as this Court may deem just and proper.

DATED:  December 16, 2011

Respectfully submitted,

Paul W. Kisslinger
Kyle M. DeYoung

Of Counsel:
Scott W. Friestad
Brian O. Quinn
Antony Richard Petrilla

Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549-5977
(202) 551-4427 (tel) (Kisslinger)
(202) 772-9292 (fax) (Kisslinger)

Local Counsel:
DANIEL G. BOGDEN
United States Attorney
District of Nevada

BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar. No. 4790
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787