# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| United States Securities and Exchange Commission, | Case No.: 2:11-cv-2011-JAD-VCF |
| Plaintiff, | |
| v. | **Order Granting in Part The Securities and Exchange Commission's Motion for Default Judgment as to Defendants Dynkowski and Smanjak [Doc. 35]** |
| Rocco Brandonisio, Jr., et al., | |
| Defendants. | |

Pending before the Court is Plaintiff United States Securities and Exchange Commission's (SEC) Motion for Default Judgment as to Defendants Dynkowski and Smanjak [Doc. 35] seeking an Order from the Court entering default judgments as to defendants Pawel P. Dynkowski and Chad P. Smanjak (collectively, "Defendants") for injunctive and monetary remedies. No opposition was filed. For the reasons set forth below, the Motion is granted in part and denied without prejudice in part.

## I.
## Background

**A.    The SEC's Complaint**[1]

This is a securities fraud action involving a "pump-and-dump" stock scheme, in which the SEC alleges the following: Former Notre Dame college football player Daniel "Rudy"

---

[1] The allegations in the SEC's Complaint, other than the amounts of money damages requested, are accepted as true in this case because both Dynkowski and Smanjak have defaulted. "An allegation - other than one relating to the amount of damages - is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. Proc. 8(b)(6). The Court also finds that to the degree the Complaint alleges fraud against the Defendants, it does so with the specificity required under Fed. R. Civ. Proc. 9(b).

1

Ruettiger founded Rudy Beverage, Inc., ("Beverage") a privately held sport drink company, to compete with market leaders such as Gatorade. Doc. 1, p. 2. Ruettiger ran Beverage out of South Bend, Indiana until October 2007. *Id.* at 7.[2] In October 2007, Rocky Brandonisio became the company's president. *Id.* at 7-8. Brandonisio relocated Beverage to Las Vegas, Nevada, where he took over day-to-day business operations. *Id.* at 8. However, the company's financial fortunes did not improve. *Id.*

In late 2007, the groundwork for the pump-and-dump scheme was laid. *Id.* First, Ruettiger and Brandonisio turned to Stephen DeCesare, an experienced penny-stock promoter who Reuttiger knew from prior business dealings. *Id.* DeCesare was given "sufficient control of [Beverage] to facilitate the scheme." *Id.*[3] Once in control, DeCesare first identified a publicly traded shell company, AccuPoll Holding Corporation, as ideal for merger, because the company "had a mechanism for creating vast quantities of purportedly unrestricted stock through the use of a convertible note." *Id.* DeCesare then tasked Kevin Quinn with executing a merger between AccuPoll and Beverage. *Id.*

On February 11, 2008, Beverage acquired AccuPoll in a reverse merger and changed AccuPoll's name to Rudy Nutrition ("RUNU"). *Id.* An entity called Rudy Partners, Ltd. held 94.9% of RUNU's stock. *Id.* Reuttiger, who owned 2.45% of RUNU stock and 43.23% of Rudy Partners, allowed his name to be placed on the SEC Form 8-K which Quinn prepared and filed with the SEC. *Id.*[4] at 8-9. After the merger, Reuttiger became RUNU's CEO and Secretary. *Id.* at 9. Brandonisio became its President, and Kevin Kaplan became its CFO. All three individuals also served as directors of RUNU, and in that capacity they signed resolutions authorizing the issuances of stock which would ultimately further the

---

[2] The Complaint does not specify how long Beverage had been in active operation prior to 2007.

[3] The SEC's Complaint refers to "RUNU" here, although in other places the Complaint alleges that DeCesare changed Beverage's name to RUNU only after a February 11, 2008, merger. *Id.* at 8. For purposes of this Order, the difference is not relevant.

[4] The SEC does not specify the other owners of RUNU stock or Rudy Partners.

fraudulent scheme. *Id.*[5]

Quinn, under DeCesare's direction, persuaded RUNU's transfer agent to issue RUNU stock in unrestricted form, claiming that the recipients were exercising assignments of portions of the convertible note. *Id.* at 9. According to the SEC, Quinn's collective statements to the transfer agent were a "sham," which was "designed to evade the registration requirements of the federal securities laws." *Id.* at 10. In this manner, RUNU issued more than 3 billion shares of "purportedly unrestricted common stock between February and September 2008." *Id.*

This issuance, through which the scheme was perpetrated, occurred in two "rounds." During the first round, which took place between February and April 2008, RUNU issued 42 million shares of stock to various individuals, including a stock promoter named Gregg Mulholland. *See id.* In exchange, Mulholland agreed to "pump" the stock. *Id.* To carry out his end of the bargain, Mulholland began an extensive direct mail campaign, an email campaign, issued press releases, and posted videos on the internet. The communications claimed, *inter alia*, that RUNU had "partnership agreements" with two large soft drink distributors; that "Rudy outsold Gatorade® 2 to 1 in a "major southwest test," and that "[i]n several blind taste tests, Rudy outperformed Gatorade® and Powerade® by 2:1." *Id.* All of these communications contained material misrepresentations. *See id.*

The "pump" scheme was clearly effective: RUNU went from trading 720 shares daily on February 27, 2008 to trading more than 3 million shares on March 24, 2008. *Id.* at 16. Between late February and early March 2008, the price of RUNU stock also climbed from $0.25 per share to $1.05 per share. *Id.* Despite the gains made through Mulholland's garden variety deceit, DeCesare and RUNU management were unsatisfied as "they had expected the scheme to provide 'funding' to keep RUNU going, but it failed to do so." *Id.* at 17. In May 2008, in search of a more exotic solution, DeCesare replaced Mulholland with Dynkowski

---

[5] The SEC's Complaint claims that Quinn later "affixed a photocopy of [the directors'] signatures to the resolutions." *Id.* at 10.

and Smanjak, who orchestrated "round two" of the pump-and-dump scheme.[6]

This involved the issuance and transfer of, *inter alia*, over 2.5 billion additional shares of stock to sixteen nominee entities, all of which were Panamanian corporations under Smanjak's *de facto* control.[7] *Id.* at 12. Smanjak's associate Joseph Saranello opened brokerage accounts for each of the Panamanian companies at Thomas Anthony, a broker-dealership located in Florida. *Id.* at 13. Gary Yocum, a registered representative at the firm, assisted Saranello to deposit large amounts of RUNU stock into each of these accounts. *Id.*[8] Dynkowski and Smanjak then "began manipulating RUNU's stock . . . through wash sales,[[9]] matched orders,[[10]] and trading coordinated with false press releases to fool investors into believing there was a genuine demand for the stock." *Id.* According to the SEC, Smanjak generally directed Dynkowski's trading. *Id.*

Round two was a wild success. One week after the pair took over, RUNU had "traded 42% more shares . . . than it had during all of February, March, and April, when Mulholland was running the first campaign to pump" the stock. *Id.* at 19. Dynkowski then instructed

---

[6]The SEC elsewhere contended that Dynkowski was a Polish national, whereas Smanjak had South African citizenship. Doc. 30, p. 4.

[7]The Complaint states that the owners of these companies were all Panamanian nationals; however, "[i]n reality, Joseph Saranello, one of Smanjak's associates, set up these companies and gave control of them to Smanjak." *Id.* at 12. To do so, Saranello used a group called Panala Offshore Legal Services, which allowed Saranell "secretly to direct the actions of the entities." *Id.* at 12. According to the SEC's Complaint, these entities were Adipaul, Inc., Battle X, Inc., Carlton Rowe, Inc., Cordillera Capital Group, Inc., Fairplay International Enterprises LLC, Falcon Real Estate Holdings, Inc., Golden Jubilee Ventures, Inc., Graysia Partners, Inc., HiJinks Productions, Inc., Independent Investors Group, Inc., Pan American Capital Group, Inc., Panama Investor Services, Inc., Prime Travel Protection, Inc., Stargate International, Inc., Synergy Property Group, Inc., XAX International Group, Inc. Doc. 1, pp. 11-12.

[8]Subsequently, Yocum "sold hundreds of millions of shares in the market at the direction of Dynkowski, Smanjak, and Saranello." *Id.* None of these new stock issuances were fully disclosed to the SEC. *Id.* at 18.

[9]According to the Securities and Exchange Commission, "[a] wash sale occurs when you sell or trade stock or securities at a loss and within 30 days before or after the sale you: [1] buy substantially identical stock or securities, [2] Acquire substantially identical stock or securities in a fully taxable trade, or [3] Acquire a contract or option to buy substantially identical stock or securities." Securities and Exchange Commission, *Wash Sales*, *available at* attp://www.sec.gove/answers/wash.htm (last visited Sept. 11, 2013).

[10]"Matched orders" means "[t]he practice of two investors buying and selling a security to each other to create the impression of higher trading volume. This is an illegal practice intended to artificially inflate the security's price." The Free Dictionary, *Matched Orders*, *available at* http://financial-dictionary.thefreedictionary.com/matched+orders (last visited Sept. 11, 2013).

RUNU to issue a false press release stating that it had received a "private placement" of $800,000, "at almost five times the previous day's closing price for RUNU shares." *Id.* In fact, RUNU had received approximately that amount from two of Smanjak's Panamanian companies, the proceeds of which had come from second round "dump" sales. *See id.*[11] By August 12, 2008, Dynkowski had "persuade[d] the public to buy more than 700 million RUNU shares sold from dump accounts that he and Smanjak controlled," which generated $6.3 million in illicit profits. *See id.* at 20. Dynkowski and Smanjak were the principal beneficiaries of these profits, sharing $4.2 million between themselves. *Id.*[12]

Smanjak's Panamanian entities finally ran out of RUNU stock in August 2008. Before RUNU's directors could issue more stock, on September 11, 2008, the SEC issued a trading suspension against RUNU. *Id.* at 21. The RUNU scheme came to an end, having grossed approximately $11 million for its participants during its lifetime. *See id.* at 2.

On December 16, 2011, the SEC filed this action against a score of defendants.[13] It specifically charged Dynkowski and Smanjak with numerous securities violations: Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (Claim I); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder (Claim II); and Sections 5(a) and 5(c) of the Securities Act (Claim III).

A relief, the SEC requested, *inter alia*, that Smanjak and Dynkowski "disgorge, with prejudgment interest, any ill-gotten gains," as well as "pay civil penalties under Securities Act Section 20(d), 15 U.S.C. § 77t(d) . . . and Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3)." *Id.* The SEC also requested an injunction against Defendants preventing them from (1) engaging in any offering of penny-stock; and (2) engaging in any future conduct in violation of several securities laws. *Id.* at 26.

---

[11]The proceeds were directly principally toward paying off the company's outstanding debts. *See id.*

[12]The SEC does not provide a breakdown of how Defendants split the $4.2 million.

[13]These were Brandonisio, DeCesare, Dynkowski, Kaplan, Mulholland, Mehmet Mustafoglu, Joseph A. Padilla, Angelo R. Panetta, Quinn, Andrea M. Ritchie, Deuttiger, Smanjak, and Yocum. Doc. 1, pp. 4-6.

**B.      Subsequent Proceedings**

Neither Smanjak nor Dynkowski answered the SEC's Complaint. On June 13, 2013, the SEC moved the Court for permission to serve these two defendants by publication, arguing that they had "fled the United States to avoid prosecution." Doc. 30, p. 1. The SEC contended that Dynkowski, who had been charged with two criminal indictments in 2009 as well as a related civil action,[14] had fled the United States, was believed to be in Europe, and "is a fugitive" *Id.* at 3. As to Smanjak, the SEC contended that in 2010 he was criminally indicted in federal court for 11 counts of wire fraud in connection with the RUNU scheme. *Id.*[15] He then fled the United States, returned to South Africa, was arrested by South African police, but posted bond and went free on bail. *Id.* He was believed to be in Africa. *Id.*

The SEC was permitted to serve Defendants by publishing notice in the *International Herald Tribune* on four consecutive Wednesdays, August 1, 8, 15, 22, 2012. Docs. 31, 32. On October 10, 2012, having received no response from either Smanjak or Dynkowski to the published notices, the SEC moved under Federal Rule of Civil Procedure 55(a) for entry of a clerk's default, which was entered the next day. Docs. 33, 34.

On December 4, 2012, the SEC moved for a default judgment against both Defendants and a proposed final judgment. *Id.* at 35-1, 35-2. Thereafter, U.S. District Judge Gloria M. Navarro[16] ordered the SEC to update its calculations in a Minute Order, which the SEC did on August 2, 2013. Docs. 36, 37.

## II.

### Discussion

The SEC has requested both injunctive and monetary relief against Defendants. It also properly complied with the requirements for entry of a default judgment, by first applying and obtaining a clerk's entry of default pursuant to Fed R. Civ. Proc. 55(a) as to its

---

[14]The SEC cites these cases as: *United States v. Pawel Dynkowski*, Cr. 1:09-0023-UNA & 1:09-0054-UNA (D. Del.); *SEC v. Dynkowski*, No. 09-361 (D. Del.).

[15]The SEC cites this case as *United States v. Smanjak*, SA CR 10-021 5 (C.D. Cal.).

[16]This case was reassigned to the undersigned on August 9, 2013. Doc. 38.

6

claims for affirmative relief, and then moving the Court for entry of a default judgment pursuant to Fed. R. Civ. Proc. 55(b)(2) as to all claims.[17] Rule 55(b)(2) also provides that default may not be entered against a minor or incompetent person unless that person is properly represented. *Id.* In this case there has been no showing that either Smanjak or Dynkowski is either a minor or incompetent. Therefore, the Court may consider the SEC's motion.

A district court has discretion to enter a judgment by default, which typically turns on the consideration of seven factors: (1) potential prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the amount of money at stake in the action; (5) the potential disputes as to material facts; (6) whether the default was due to excusable neglect; and (7) the strong federal policy favoring adjudications on the merits. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

**A.     Possibility of Prejudice, Substantive Merits, and Sufficiency of Complaint**

The Court finds that the first, second, and third *Eitel* factors all weigh in favor of a default judgment. As to the first factor, the SEC will likely suffer potential prejudice if default judgment is not entered, as Defendants have failed to answer the Complaint, and according to the SEC actually fled the country to avoid prosecution. As to the second and third factors, the SEC's Complaint appears both sufficient and to have merit because it properly identifies the Defendants' conduct, as well as the applicable securities laws that form the basis of the SEC's action. Thus, the Complaint is both meritorious and sufficient under the liberal pleading standards of Fed. R. Civ. Proc. 8.

**B.     Sum of Money at Stake**

The fourth *Eitel* factor takes into account the amount of money at stake and the seriousness of the defendant's conduct, which involves an assessment of whether the recovery sought is proportional to the harm which the defendant's conduct has caused.

---

[17] The SEC was not required to seek a clerk's entry of default as to its claims for injunctive relief prior to filing its motion for a default, and that Motion did not distinguish between its claims. However, any potential duplication is harmless. *See* Rule 55(b)(2).

7

Amounts far less than that alleged by the SEC have been deemed "significant" for purposes of the default judgment analysis. *See, e.g.*, *Trustees of the Bricklayers & Allied Craftworkers Local 13 Defined Contribution Pension Trust for Southern Nevada v. Tumbleweed Development, Inc.*, 2013 WL 143378, at *3 (D. Nev. Jan. 11, 2013) (citations omitted) (analyzing *Eitel* factors in ERISA benefits action, and finding that amount of less than $20,000 was "significant."). In this case, it is reasonable to conclude that the amount of money at stake as between the two prime movers in a complex, multinational securities fraud scheme involving illicit transfers of 700 million shares of stock and an alleged $11 million of gross pecuniary gains is also "significant."

However, the SEC has not given any indication that the amount requested, even if *significant*, is also *proportional* to the harm these two Defendants caused. Other courts have found that proportionality weighed in favor of default for an alleged securities violation where the amount of damages was "reasonably certain." *Securities and Exchange Commission v. Clark*, 2010 WL 908247, at *2 (N.D. Cal. Mar. 8, 2010) (finding that SEC adequately supported their request for damages by providing, *inter alia*, a "well-supported calculation based on tallying of bank records."). The SEC has failed to provide the Court with any documentation supporting its claim that the Defendants actually garnered $4.2 million from the pump-and-dump scheme, and thus the amount is not "reasonably certain."

The reason for this uncertainty appears to be of the Defendants' own doing, as Defendants have by the SEC's account fled the country in order to avoid prosecution for their illegal actions. *See* Doc. 30, p. 3. Defendants also confounded the SEC's calculation efforts by utilizing foreign "front" companies to control the flow of stock and money during the scheme. Moreover, Thomas Anthony, the Florida broker which Defendants utilized to sell the RUNU stock, was alleged to be defunct by the time the SEC filed its Complaint. *See* Doc. 1. Other courts have noted that, in general, where a defendants' illegal conduct has created an uncertainty regarding calculation of disgorgement amounts in a securities enforcement action, the ambiguity should be resolved against them. *Security Exchange Commission v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1190 (D. Nev. 2009).

Defendants likely have concrete evidence of their ill-gotten gains in their possession, and Defendants' illegal conduct has created the ambiguity which confounds the precise calculation of a judgment amount. Therefore, on balance this factor weighs slightly in favor of granting a default judgment.

**C.     Possible Dispute as to Material Facts**

The fifth *Eitel* factor relates to potential disputes about material facts. Here, a number of material facts have already been deemed admitted as a matter of law. "An allegation - other than one relating to the amount of damages - is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. Proc. 8(b)(6). But money damages, by contrast, cannot be taken into consideration as a matter of law. *See Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977) (citation omitted) ("[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."). Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Proc. 9(b).

Defendants have failed to file any responsive pleading or deny the SEC's allegations. Accordingly, the Court finds that no genuine dispute of material fact would preclude granting the SEC's Motion, aside from the determination of a monetary award that cannot be deemed admitted by operation of law, and further finds that the SEC has pled its fraud claims with the specificity required under Fed. R. Civ. Proc. 9(b). Thus, the fifth factor weighs in favor of a default judgment.[18]

**D.     Excusable Neglect**

The sixth *Eitel* factor considers whether the default has resulted from excusable neglect. There is no evidence to suggest excusable neglect here. The record reflects that a summons was issued by international publication on four occasions between August 1, 2012

---

[18] Given the length of the SEC's Complaint, the Court declines to reiterate the "admitted" allegations here.

and August 22, 2012. Doc. 32. The SEC then moved for entry of default on October 11, 2012, after Defendants' opportunity to answer or otherwise respond expired under Fed. R. Civ. Proc. 12. Doc. 6. Thus, Defendants were provided with an adequate opportunity to respond to the SEC's allegations. Since that time, Defendants have had more than eleven months to offer any excusable neglect facts and challenge the entry of default. As Defendants have failed to do so, the Court finds that the sixth *Eitel* factor weighs in favor of entering a default judgment.

### E.   Decision on the Merits

The final *Eitel* factor takes into consideration the strong policy preference for disposing of cases on their merits. *See Eitel*, 782 F.2d at 1472. Defendants' failure to answer the SEC's Complaint or otherwise engage in the litigation process casts doubt over the feasibility of any eventual decision on the merits. The Court, therefore, finds that the ordinary policy preference in favor of decisions on the merits will not, without more, preclude entry of a default judgment.

In their totality, the *Eitel* factors weigh in favor of a default judgment.

### F.   Default as to Injunctive Relief Claims

Having found that the SEC is entitled to a default judgment, the Court now turns to the specific injunctive relief that the SEC has requested. The SEC requests that both Defendants be enjoined from engaging in future violations of: (1) Exchange Act Section 10(b), 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) Securities Act Section 5(a), 15 U.S.C. § 77e(a); (3) Securities Act Section 5(c), 15 U.S.C. § 77e(c); and (4) Securities Act Section 17(a) 15 U.S.C. § 77q(a). Docs. 1, pp. 26-27; 35, p. 15.

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1) provide that, upon a proper showing, a permanent injunction shall be granted in an enforcement action brought by the Commission. Prior to granting a permanent injunction, courts consider whether there is a reasonable likelihood of a

future violation, considering five factors: (1) the degree of scienter[19] involved; (2) whether the infraction was recurrent in nature; (3) whether the defendant recognized the wrongful nature of the conduct; (4) the likelihood of future violations; and (5) the sincerity of the defendant's assurances against future violations. *Securities and Exchange Commission v. Murphy*, 636 F.2d 633, 654-56 (9th Cir. 1980).

The Court finds that consideration of the *Murphy* factors weighs in favor of permanent injunctions against both Defendants on all counts. First, Defendants' degree of scienter was high, as Dynkowski was an experienced broker and Smanjak was a sophisticated businessman who knew how to establish and control offshore entities by proxy. Both Defendants took substantial responsibilities for carrying out a deliberate and fraudulent scheme through a series of sophisticated business transactions. Second, Defendants' infractions involved repeated active and intentional misrepresentations, which resulted in the sale of over 700 million shares of stock.

Analysis of the third, fourth, and fifth *Murphy* factors is confounded by Defendants' failure to file any documents into the record. However, as to the third factor, Defendants have "recognized" the wrongful nature of their conduct only by implication, in that they have filed no answer or other response to the Complaint. As to the fourth factor, awarding permanent injunctions against both Defendants as requested is the best guarantee that the scheme will not be repeated. Finally, the Court has received no "assurances" whatsoever that either Dynkowski or Smanjak will not repeat their unlawful conduct.

In sum, the *Murphy* factors weigh heavily in favor of entering a permanent injunction against Defendants because there is a high likelihood of future violations. Thus, the Court finds that the default should be awarded as to all of its claims for injunctive relief against Dynkowski and Smanjak as requested in the SEC's Motion for Default. Doc. 35.

---

[19]"Scienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. Securities and Exchange Commission*, 595 F.3d 1034, 1041 (9th Cir. 2010) (citation omitted). Establishing scienter requires a subjective inquiry into the defendant's state of mind. *See id.*

**G.      Default as to Penny-Stock Bar**

The SEC also requests entry of default barring both Defendants from participating in future penny-stock offerings, pursuant to Securities Act Section 20(g), 15 U.S.C. § 77t(g), and Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6). Docs. 1, p. 26; 35, p. 16.

The Court may enter an order prohibiting a party from participating in a penny-stock offering against "any person participating in, or, at the time the alleged misconduct who was participating in, an offering of penny-stock." 15 U.S.C. § 78u(d)(6)(A). Similar to the standard for granting permanent injunctions, a Court considers (1) the egregiousness of the underlying violation, as well as the defendant's (2) status as a recidivist; (3) role or position when engaging in the fraud; (4) economic stake in the violation; and (5) the likelihood the misconduct will occur. *Securities and Exchange Commission v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998) (quotation omitted).

Defendants' conduct warrants imposition of a penny-stock participation bar. First, the violation in question resulted in losses of millions of dollars from the investing public. Second, the SEC has claimed that Dynkowski is a "recividist" who was criminally charged in the U.S. District Court for the District of Delaware in connection with another penny-stock scheme. Doc. 35, p. 17.[20] Third, both Defendants occupied critical positions in the second phase of the scheme, as they assumed responsibility for manipulating apparent demand for the RUNU stock and providing offshore corporate conduits through which the "pumped" RUNU stock, and their ill-gotten proceeds from its sale, could pass largely undetected. Fourth, both defendants acted with a high degree of scienter by actively and purposefully manipulating consumer demand for the RUNU stock while taking deliberate steps to "cover their tracks." Fifth, the Defendants' economic stake in the scheme was significant, as they allegedly divided the lion's share of the profits from the second phase of the scheme - $4.2 million - between them. Finally, the Court has been provided no indication that the misconduct will not recur.

---

[20]The SEC does not contend that Smanjak is a recidivist.

In sum, the *Bancorp* factors also weigh heavily in favor of barring both Dynkowski and Smanjak from participating in future penny-stock offerings. The Court finds that the SEC's Motion for default should be granted as to this request.

**H.     Determination of Default Award**

      **1.     Disgorgement and Prejudgment Interest**

           **a.     Liability for Disgorgement**

The SEC contends that disgorgement is appropriate against Dynkowski and Smanjak jointly and severally in the amount of $4.2 million dollars. Doc. 25, p. 17. In its supplemental motion it also contends that both Defendants should be liable for prejudgment interest of $4,998,754.20 each. Doc. 37-3, p. 1.

"[A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *Securities and Exchange Commission v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (quotation omitted); *see Securities and Exchange Commission v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993). To order disgorgement, the court need not find a likelihood of future violations, but only that the defendant has no right to retain the funds illegally taken from the victims. *Securities and Exchange Commission v. Colello*, 139 F.3d 674, 679 (9th Cir. 1998). The Ninth Circuit has also found that where defendants have unlawfully received money from investors by distributing unregistered securities, they essentially received an "interest free loan" and should be liable for prejudgment interest on any disgorgement amounts awarded. *Platforms Wireless*, 617 F.3d at 1099.

Trial courts in this circuit have affirmed disgorgement rulings against stock promoters who, like Dynkowski, made material misrepresentations about the promoted stock, and profited from sale of the stock itself. *See Securities and Exchange Commission v. Abellan*, 674 F. Supp. 2d 1213, 1221 (W.D. Wash. 2009) (finding promoter and promoter's entities were jointly and severally liable for disgorgement amount). Allowing Dynkowski to retain

his ill-gotten gains is contrary to principles of unjust enrichment, which the securities laws are designed to prevent. *See Rind*, 991 F.2d at 1491-93. Thus, a finding that Dynkowski should be liable for disgorgement and prejudgment interest on the amount of disgorgement would be reasonable in this instance. However, based on the analysis below, the Court finds that this particular relief is currently premature.

Similarly, the Court finds that Smanjak should be liable for disgorgement because he actively allowed entities under his control to become the conduits through which over 700 million shares of RUNU stock were unlawfully distributed to the public, while also generally directing Dynkowski's trading efforts. *See Abellan*, 674 F. Supp. 2d at 1221. Thus, a finding that Smanjak should be liable for disgorgement and prejudgment interest on the amount of disgorgement would be reasonable in this instance, but, based on the analysis below, the Court finds that this particular relief is not currently available.

The SEC also requests joint and several liability against Dynkowski and Smanjak for the disgorgement amount. A finding that any disgorgement or monetary remedy be joint and several would be reasonable in this instance. *See, e.g.*, *CMKM Diamonds*, 635 F. Supp. 2d at 1196. However, based on the analysis below, the Court finds that this particular relief is also premature.

### b. Reasonable Approximation

However, the Court does not find that the SEC sufficiently approximated Dynkowski's and Smanjak's ill-gotten gains because the SEC does not attach any supporting evidence to its Motion. Disgorgement includes all gains flowing from illegal activities. *Platforms Wireless*, 617 F.3d at 1096. To demonstrate the disgorgement amount, the SEC meets its burden of persuasion by showing that the defendants' ill-gotten gains are a "reasonable approximation" of the amount of unjust enrichment. *Id.*[21]

Even accepting that Defendants' conduct has created the accounting uncertainty,

---

[21]*Platforms Wireless* also states that after proving that the disgorgement amount is a "reasonable approximation," the defendant has the opportunity to disprove the reasonableness of that assessment. *See id.* In this case, Defendants have not filed any opposition to the SEC's Motion, and so this element of the court's customary inquiry is not relevant.

14

which should be construed against them, *see CMKM Diamonds*, 635 F. Supp. 2d at 1190, the Court notes that the SEC has furnished the Court with no evidence whatsoever that the requested $4.2 million figure is a "reasonable approximation" of Defendants' ill-gotten gains. *See, e.g.*, *Securities and Exchange Commission v. Earthly Minerals Solutions, Inc.*, 2011 WL 1103349, at *4 (D. Nev. 2011) (finding that SEC had provided "reasonable approximation" of disgorgement damages by citing to, *inter alia*, Defendant's deposition testimony and admission in pretrial order as to the amount of claims sold, conjoined with records of investor claims). The Court finds that the SEC's Motion for disgorgement and prejudgment interest derived therefrom must be denied without prejudice, subject to re-filing with presentation of more sufficient evidence of why $4.2 million disgorgement is a "reasonable approximation" of Defendants Dynkowski and Smanjak's collective ill-gotten gains in this case. The SEC is granted sixty days from the date of this Order to supplement and re-file its request. In the event the SEC does so, it shall also provide the Court with updated pre-judgment interest calculations for the Defendants.

### 2.     Civil Penalty

#### a.     Liability for Civil Penalties

The SEC contends that the Court should also impose civil penalties against Dynkowski and Smanjak equal to their "gross pecuniary gain" in this case. Doc. 35, p. 20. "Given the gravity of the defendants' misconduct . . . a penalty that is equal to their gross pecuniary gain is fair and reasonable under the circumstances." *Id.* at 21. The SEC thus requests that the Court impose penalties of $4.2 million *each* against Dynkowski and Smanjak. *Id.*

Under either the Securities Act, 15 U.S.C. § 77t(d)(1), or the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), "[w]henever it shall appear to the Commission that any person has violated any provision of this subchapter . . . the Commission may bring an action in a United States District Court . . . and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." *Id.*

The statutes both provide three tiers for determining the appropriate penalty. *See id.* at

§§ 77t(d)(2); 78u(d)(3). In the first tier, penalties are imposed for "violations" of the statute, without more. *Id.* at §§ 77t(d)(2)(A); 78u(d)(3)(B)(i). The second tier covers securities violations which involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* at §§ 77t(d)(2)(B); 78u(d)(3)(B)(ii). Finally, third tier violations are second tier securities violations which additionally "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* at §§ 77t(d)(2)(C); 78u(d)(3)(B)(iii).

In this case, the Court would have little difficulty finding that both Defendants should be liable for third-tier penalties under the Securities Act and the Exchange Act based on the default facts. *See, e.g.*, *CMKM Diamonds*, 635 F. Supp. 2d at 1191-92 (finding that third-tier penalties were permissible for defendant who fraudulently and deceitfully sold stock which resulted in a defrauding of investors); *Earthly Mineral Solutions*, 2011 WL 1103349, at *4-*5 (finding third-tier civil penalties warranted where defendant fraudulently induced investors to lose $20 million in business venture). But, again, the SEC has not sufficiently supported this Motion to allow that award at this time.

### b.      Calculation of Civil Penalties

Under both the Securities Act and the Exchange Act, "[t]he amount of penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2)(A); 78u(d)(3)(B)(i). The statutes provide that for tier three violations, the court may impose a penalty for each violation ($100,000 for natural persons), or alternatively impose "the gross amount of pecuniary gain to such defendant as a result of the violation." *Id.* at §§ 77t(d)(2)(C); 78u(d)(3)(B)(iii). *See also Securities and Exchange Commission v. Yuen*, 272 F. App'x 615, 618 (9th Cir. 2008) (permitting both disgorgement and civil penalties).

Courts calculate tier three penalties either by multiplying the defendant's violations by a dollar amount, or by imposing a flat penalty equal to the defendant's gross pecuniary gain. *CMKM Diamonds*, 635 F. Supp. 2d at 1192 (citation omitted). Courts also generally consider the five *Murphy* factors in considering whether to make an award. *Murphy*, 636 F.2d at 654-56; *CMKM Diamonds*, 635 F. Supp. 2d at 1192 (analyzing *Murphy* factors in

analysis of civil penalties); *Securities and Exchange Commission v. Alpha Telecom, Inc.*, 187 F. Supp. 2d 1250, 1263 (D.Or. 2002) (same).

Here, the clearly voluminous number of transactions at issue, which involved transfer of over 700 million shares of stock, makes imposition of a per-violation penalty practically difficult. The Court thus adopts the second approach in determining an adequate third-tier penalty against both Defendants. The Court finds that for reasons previously stated, the *Murphy* factors weigh in favor of imposing a substantial penalty against both Defendants.

However, as with the calculation of ill-gotten gains for purposes of disgorgement, the Court is troubled by the SEC's lack of evidence supporting its civil penalty requests. Courts in this District are even less willing to impose specific civil penalties against Defendants without an adequate factual showing than they are towards disgorgement. *See Earthly Minerals Solutions*, 2011 WL 1103349, at *4-*5 ("[s]ince the court has not been provided with an exact number of investors who were victims of the violations, the court is unable to calculate an appropriate award of civil penalties at this time."). Although the *Earthly Minerals Solutions* court's concerns arose from its election to impose civil penalties on a per-violation basis, in this case the SEC provides no evidence to surpass the "reasonable approximation" standard for disgorgement purposes, and thus the Court cannot even estimate whether $4.2 million is an amount equal to Defendants' gross pecuniary gain.[22]

Therefore, the SEC's request for civil penalties must also be denied without prejudice, subject to re-filing with presentation of more sufficient evidence of why $4.2 million in civil penalties is equal to Defendants Dynkowski and Smanjak's gross pecuniary gain. The SEC is granted sixty days from the date of this Order to properly supplement and re-file its request.

---

[22]Indeed, although the SEC first requests imposition of civil penalties in amounts "equal to their disgorgement," Doc. 35, p. 19, it later appears to request imposition of $4.2 million in damages against *both* defendants. Doc. 35, p. 21. However, assuming that the $4.2 million figure is accurate and that it was split evenly between Dynkowski and Smanjak, ordering the relief the SEC seeks would result in a double penalty if both defendants ultimately paid, and that would not be an accurate reflection of each defendant's "gross pecuniary gain" in this case.

17

# III.
## Conclusion

Accordingly, based upon the foregoing reasons and with good cause appearing and no reason for delay,

It is **ORDERED** that the SEC's Motion for Default Judgment as to Defendants Dynkowski and Smanjak [Doc. 35] is **GRANTED** in part and **DENIED** without prejudice in part:

1. That the SEC's Motion is **GRANTED** as to injunctive relief against Defendant Pawel P. Dynkowski and Defendant Chad P. Smanjak.  It is hereby **ORDERED** that Dynkowski and Smanjak are permanently enjoined from further violations of (1) Exchange Act Section 10(b), 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) Securities Act Section 5(a), 15 U.S.C. § 77e(a); (3) Securities Act Section 5(c), 15 U.S.C. § 77e(c); and (4) Securities Act Section 17(a), 15 U.S.C. § 77q(a).  It is further **ORDERED** that Dynkowski and Smanjak are also permanently barred from participating in a penny-stock offering, pursuant to Securities Act Section 20(g), 15 U.S.C. § 77t(g), and Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6).  The clerk shall enter judgment accordingly.

2. The SEC's Motion for specific monetary awards of (1) disgorgement of $4.2 million jointly and severally against Dynkowski and Smanjak, (2) prejudgment interest on the disgorgement amount of $4,998,754.20 jointly and severally against Dynkowski and Smanjak, and (3) civil penalties of $4.2 million against both Dynkowski and Smanjak, is **DENIED** without prejudice.  The SEC shall have 60 days from the issuance of this Order to re-file its Motion with regard to specific monetary amounts, and attempt to cure the deficiencies identified herein.  In the event that the SEC re-files its Motion, it shall also provide updated pre-judgment interest calculations for the Defendants.

DATED: September 24, 2013.

_____
JENNIFER A. DORSEY
UNITED STATES DISTRICT JUDGE

18