# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

United States Securities and Exchange Commission,

    Plaintiff,

    v.

Rocco Brandonisio, Jr., et al.,

    Defendants.

Case No.: 2:11-cv-2011-JAD-VCF

**Order Granting in Part The Securities and Exchange Commission's Motion for Entry of Final Judgments Determining Monetary Remedies as to Defendants Mulholland and Ritchie [Doc. 25]**

Pending before the Court is Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Entry of Final Judgments Determining Monetary Remedies as to Defendants Mulholland and Ritchie [Doc. 25] seeking an Order from the Court entering judgments against defendants Gregg R. Mulholland and Andrea M. Ritchie (collectively, "Defendants"). Neither defendant has opposed the motion.

## I.
## Background

**A.    The SEC's Complaint**[1]

This is a securities fraud action involving a "pump-and-dump" stock scheme, in which the SEC alleges the following: Former Notre Dame college football player Daniel "Rudy" Ruettiger founded Rudy Beverage, Inc., ("Beverage") a privately held sport drink company,

---

[1] These facts are deemed true for purposes of the instant motion and thus accepted by the Court. *See* Docs. 6-1 at p. 2 ¶ 3(c); 12-1, at p. 2 ¶ 3(c); 18 at p. 5 ¶ VI(c); 24 at p. 3 ¶ III(c) (whereby Mulholland and Ritchie agree and the District Court ordered that "the allegations of the Complaint shall be accepted as and deemed true by the Court" for purposes of the instant Motion).

1

to compete with market leaders such as Gatorade. Doc. 1, p. 2. Ruettiger ran Beverage out of South Bend, Indiana until October 2007. *Id.* at 7.[2] In October 2007, Rocky Brandonisio became the company's president. *Id.* at 7-8. Brandonisio relocated Beverage to Las Vegas, Nevada, where he took over day-to-day business operations. *Id.* at 8. However, the company's financial fortunes did not improve. *Id.*

In late 2007, the groundwork for the pump-and-dump scheme was laid. *Id.* First, Ruettiger and Brandonisio turned to Stephen DeCesare, an experienced penny stock promoter who Reuttiger knew from prior business dealings. *Id.* DeCesare was given "sufficient control of [Beverage] to facilitate the scheme." *Id.*[3]

Once in control, DeCesare first identified a publicly traded shell company, AccuPoll Holding Corporation, as ideal for merger, because the company "had a mechanism for creating vast quantities of purportedly unrestricted stock through the use of a convertible note." *Id.* DeCesare then tasked Kevin Quinn with executing a merger between AccuPoll and Beverage. *Id.*

On February 11, 2008, Beverage acquired AccuPoll in a reverse merger and changed AccuPoll's name to Rudy Nutrition ("RUNU"). *Id.* An entity called Rudy Partners, Ltd. held 94.9% of RUNU's stock. *Id.* Ruettiger, who owned 2.45% of RUNU stock and 43.23% of Rudy Partners, allowed his name to be placed on the SEC Form 8-K which Quinn prepared and filed with the SEC. *Id.*[4] at 8-9. After the merger, Reuttiger became RUNU's CEO and Secretary. *Id.* at 9. Brandonisio became its President, and Kevin Kaplan became its CFO. All three individuals also served as directors of RUNU, and in that capacity they signed resolutions authorizing the issuances of stock which would ultimately further the

---

[2]The Complaint does not specify how long Beverage had been in active operation prior to 2007.

[3]The SEC's Complaint refers to "RUNU" here, although in other places the Complaint alleges that DeCesare changed Beverage's name to RUNU only after a February 11, 2008, merger. *Id.* at 8. For purposes of this Order, the difference is immaterial.

[4]The SEC does not specify the other owners of RUNU stock or Rudy Partners.

2

fraudulent scheme. *Id.*[5]

Quinn, under DeCesare's direction, persuaded RUNU's transfer agent to issue RUNU stock in unrestricted form, claiming that the recipients were exercising assignments of portions of the convertible note. *Id.* at 9. According to the SEC, Quinn's collective statements to the transfer agent were a "sham," which was "designed to evade the registration requirements of the federal securities laws." *Id.* at 10. In this manner, RUNU issued more than 3 billion shares of "purportedly unrestricted common stock between February and September 2008." *Id.*

This issuance, through which the scheme was perpetrated, occurred in two "rounds." During the first round, which took place between February and April 2008, RUNU issued, *inter alia*, 17.1 million shares of stock to Mulholland, much of which went to entities which Mulholland controlled. *Id.* at 10-11.[6] In exchange, Mulholland agreed with DeCesare to "pump" RUNU's stock, a process he began in March 2008. *Id.* at 13.

To "pump" the stock, Mulholland began a direct mail campaign, an email campaign, and posted videos on the internet. *Id.* The mail campaign, which reached over 2 million U.S. households, claimed that RUNU had "partnership agreements" with two large soft drink distributors. *Id.* Mulholland also issued press releases to this effect. *Id.* at 14. Mulholland failed to disclose the extent of his RUNU stock ownership in the mailers. *Id.* These materially false and misleading statements were repeated on RUNU's Form 8-K and 10-K SEC filings. *Id.* at 15. Mulholland then commissioned a United Kingdom resident to tout RUNU to investors who had signed up for an internet newsletter. *Id.* The subsequently promulgated electronic mailings falsely or misleadingly claimed that "Rudy outsold Gatorade® 2 to 1 in a "major southwest test," and that "[i]n several blind taste tests, Rudy

---

[5] The SEC's Complaint alleges that Quinn later "affixed a photocopy of [the directors'] signatures to the resolutions." *Id.* at 10.

[6] 2,857,143 shares were issued to each of Bruin Industries, Inc., Griffen Trading Co., and Serrisan Investment Holdings, Inc. - companies which Mulholland owned. *Id.* The Complaint then alleges that "Mulholland also directed that some of the shares be issued to entities controlled by certain associates." *Id.* Later in the Complaint, the SEC alleges that Mulholland received 20 million shares of RUNU stock. *Id.* at 13. This difference is immaterial.

3

outperformed Gatorade® and Powerade® by 2:1." *Id.* Mulholland also appeared personally in two internet videos, where he reiterated the claim about Rudy's outperforming Gatorade in taste tests, and advised viewers to purchase the RUNU stock.

The "pump" scheme was clearly effective: RUNU went from trading 720 shares daily on February 27, 2008 to trading more than 3 million shares on March 24, 2008. *Id.* at 16. Between late February and early March 2008, the price of RUNU stock also climbed from $0.25 per share to $1.05 per share. *Id.* Thereafter, Mulholland and others began "dumping" their RUNU stock; by the end of April 2008, Mulholland had sold approximately $1,707,704 of his prior holdings. *Id.* To sell the stock, Mulholland turned to Ritchie, a registered representative at Scottsdale Capital Advisors, L.L.C. ("Scottsdale"). *Id.* Ritchie received $37,666 in commissions from the sales of RUNU stock, which included Mulholland's own. *Id.*

Despite the gains made during "round one" of the pump-and-dump scheme, DeCesare and RUNU management were unsatisfied as "they had expected the scheme to provide 'funding' to keep RUNU going, but it failed to do so." *Id.* at 17. DeCesare replaced Mulholland with two other individuals,[7] who orchestrated "round two" of the pump-and-dump scheme beginning in May 2008. *Id.* At this point, Mulholland's involvement in the "pumping" aspect of the scheme ended. *Id.* However, Mulholland continued "dumping" his RUNU stock until June 2008, grossing an additional $607,747 in proceeds. *Id.* at 23. The scheme finally ended on September 11, 2008, when the SEC issued a trading suspension against RUNU. *Id.* at 21.

On December 16, 2011 the SEC filed this action, charging Mulholland with numerous securities violations. Specifically, it charged Mulholland with violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (Claim I); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder (Claim II); Sections 5(a) and 5(c) of the Securities Act (Claim III); and Section 17(b) of the Securities Act (Claim IV). *Id.* at 23-26. The SEC also

---

[7]These individuals were Chad P. Smanjak and Pawel P. Dynkowski.

4

charged Ritchie under Claim II. *Id.* at 24.

A relief, the SEC requested, *inter alia*, that Mulholland and Ritchie "disgorge, with prejudgment interest, any ill-gotten gains," as well as "pay civil penalties under Securities Act Section 20(d), 15 U.S.C. § 77t(d)." *Id.* at 26.  The SEC also requested that Mulholland, but not Ritchie, "pay civil penalties under . . . Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3)." *Id.*  The SEC also requested injunctive relief against Mulholland and Ritchie from (1) engaging in any offering of penny stock; and (2) engaging in any future conduct in violation of several securities laws. *Id.* at 26.

**B.     Subsequent Proceedings**

Neither Mulholland nor Ritchie answered the SEC's Complaint.  Instead, both Mulholland and Ritchie submitted "consent documents."  Docs. 6-1, 12-1.  Therein, both Defendants "entered a general appearance," in which, "without admitting or denying the allegations of the complaint," they consented to the Court's jurisdiction, as well as to entry of a final judgment as to the specific injunctive relief which the SEC had individually charged against them. *Id.* at 1-2.[8]

Defendants also consented that "upon motion of the Commission, the Court shall determine whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act . . . and Section 21(d)(3) of the Exchange Act . . . and if so, the amount(s) of the disgorgement and/or civil penalty." *Id.* at 2.[9]  Defendants also consented that "if disgorgement is ordered [they] shall pay prejudgment interest thereon, calculated from September 30, 2008," pursuant to 26 U.S.C. § 6621(a)(2). *Id.*  Defendants also consented that the SEC's allegations in the Complaint were taken as true and correct, and that they were precluded from challenging the validity of the Consents or

---

[8] With the exception of injunctive relief charged, which is inapposite for purposes of the instant Order, the scope of consent contained in Mulholland and Ritchie's consent documents is substantively identical. Therefore, citations to a single document suffice as a citation for each.  Mulholland's Consent Judgment contains a hand-written note by "Irving Einhorn, Esq.," which states, "[t]he words 'final judgment' in this Consent refer to the 'Judgment as to Gregg R. Mulholland' attached hereto." Doc. 6-1, p. 1.

[9] Ritchie had not been charged with violating Section 21(d)(3) of the Exchange Act in the SEC's Complaint, but Section 10(b) of the Exchange Act.  This difference is immaterial for purposes of this Order.

Final Judgments. *Id.*[10]

On January 19, 2012, U.S. District Judge Gloria M. Navarro[11] signed Rule 54(b) Judgments against Mulholland and Ritchie, which reflected the language of the Consent Judgments. Docs. 18, 24. Thereafter, on June 13, 2012, the SEC filed the instant motion. Doc. 25.[12] Therein, it sought an entry of Judgment against Mulholland for disgorgement ($2,417,311.76), which reflects the Mulholland's profit from the sale of RUNU stock after post-Complaint calculations were made. *Id.* at 4, 10. The SEC also requested $375,206.45 in prejudgment interest, which it claimed was the correct figure after applying 26 U.S.C. § 6621(a)(2) to the period from September 30, 2008 to June 1, 2012. *Id.* at 11. The SEC also requested a civil penalty of $2,417,311.76 against Mulholland. *Id.* at 4. The SEC also sought entry of Judgment against Ritchie for disgorgement ($34,357.93), which reflects the commissions she earned on transactions of the RUNU stock; prejudgment interest ($5,332.56); and a civil penalty ($40,000.00). *Id.* at 4, 11. Neither Defendant filed an opposition to the SEC's Motion.

Thereafter, on August 1, 2013, Judge Navarro ordered the SEC to file an updated calculation of its request for prejudgment interest. Doc. 36. The SEC did so on August 2, 2013. Doc. 37. Therein, the SEC stated that it now seeks prejudgment interest from October 1, 2008, and calculated the prejudgment interest on Mulholland and Ritchie's disgorgement amounts at $459,723.34 and $6,534.20, respectively. Doc. 37, p. 2.[13] Again, neither Defendant opposed the SEC's updated calculations.

---

[10]Mulholland signed his consent on July 14, 2011; Ritchie on December 7, 2011. Docs. 6-1, pp. 5-6; 12-1, p. 5.

[11]This case was reassigned to the undersigned on August 9, 2013. Doc. 38.

[12]The Motion was accompanied by three separately filed documents: two Declarations and an Exhibit. Docs. 26, 27, 28.

[13]Having never been provided with information supporting the imposition of interest for September 30, 2008 as originally requested, the Court construes the September 30, 2008 accrual date as abandoned.

6

## II.

## Discussion

**A.     Disgorgement**

**1.     Liability for Disgorgement**

The SEC contends that disgorgement is appropriate here because Mulholland was the primary "pumper" of the RUNU Stock during the "round one" of the scheme. Doc. 25, p. 13. In this role, Mulholland "made and issued false and misleading statements in promotional materials and internet videos sent to, and viewed by, millions of investors." *Id.* Similarly, the SEC argues that Ritchie "was a registered representative" who "abused her position as a securities professional, ignored red flags, and failed to conduct a reasonable inquiry into the registration status of the RUNU stock." *Id.* at 14.

"[A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *Securities and Exchange Commission v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (quotation omitted); *see Securities and Exchange Commission v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993). To order disgorgement, the court need not find a likelihood of future violations, but only that the defendant has no right to retain the funds illegally taken from the victims. *Securities and Exchange Commission v. Colello*, 139 F.3d 674, 679 (9th Cir. 1998).

Trial courts in this circuit have affirmed disgorgement rulings against stock promoters who, like Mulholland, failed to adequately disclose the compensation they received for touting certain stock, made material misrepresentations about the promoted stock, and profited from sale of the stock itself. *See Securities and Exchange Commission v. Abellan*, 674 F. Supp. 2d 1213, 1221 (W.D. Wash. 2009) (finding promoter and promoter's entities were jointly and severally liable for disgorgement amount). Allowing Mulholland to retain his ill-gotten gains is contrary to principles of unjust enrichment, which the securities laws are designed to prevent. *See Rind*, 991 F.2d at 1491-93. Thus, the Court finds that

7

Mulholland should be liable for disgorgement.

The Ninth Circuit has also held broker-dealers like Ritchie liable for disgorgement. *Hateley v. Securities and Exchange Commission*, 8 F.3d 653, 655 (9th Cir. 1993) (imposing joint and several liability on broker-dealer firm and executives of firm).  Requiring Ritchie to disgorge the commissions she earned through the sale of RUNU stock would assist in demonstrating that violations of the securities laws are "unprofitable." *Platforms Wireless*, 617 F.3d at 1096.  Thus, the Court finds that Ritchie should also be liable for disgorgement.

**2.      Reasonable Approximation**

The SEC argues that Mulholland and Ritchie are liable for amounts of $2,417,311.76 and $34,357.93, respectively.  Doc. 25, p. 14.  In support of these two figures, the SEC submits the Declaration of D. Michael Cruz, Legal Counsel at Scottsdale.  Doc. 26, p. 1. Cruz affirms that upon request of the SEC, Scottsdale employees searched their records for information related to commissions received for "executing various customer order for the stock of Rudy Nutrition." *Id.* at 2.  Cruz affirms that Ritchie was the employee who executed those orders, and that she was paid a commission of 90% on all of the above-mentioned trades.  *Id.*  Cruz attaches a list of the transactions involving Mulholland's companies that Ritchie executed. *See* Doc. 26-2.[14]

The SEC also attaches the Declaration of Richard Petrilla, a Senior Counsel in the SEC's Enforcement Division.  Doc. 25-3, p. 1.  Petrilla affirms that a calculation of the RUNU stock purchased and sold by companies which Mulholland owned results in a disgorgement figure for Mulholland of $2,417,311.76.  *Id.* at 4.  Petrilla also affirms that he has reviewed the Scottsdale documents in order to calculate a disgorgement figure for Ritchie of $34,357.93.

Disgorgement includes all gains flowing from illegal activities. *Platforms Wireless*, 617 F.3d at 1096.  To demonstrate the disgorgement amount, the SEC meets its burden of

---

[14]The SEC has also submitted the Declaration of Kimberly Miller, Director of Regulatory Compliance for Pension Financial Services, Inc.  Doc. 27.  This Declaration submits evidence that Mulholland owned or controlled the entities from which the disgorgement calculation was made. *See id.*

8

persuasion by showing that the defendants' ill-gotten gains are a "reasonable approximation" of the amount of unjust enrichment. *Id.*[15] A detailed accounting is not required. *See Securities and Exchange Commission v. First Pacific Bancorp*, 142 F.3d 1186, 1192 & n.6 (9th Cir. 1998); *Security Exchange Commission v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1190 (D. Nev. 2009) (citing *Bancorp*). Indeed, doubts regarding the disgorgement amounts should be resolved against the defendants, whose illegal conduct created the uncertainty. *See CMKM Diamonds*, 635 F. Supp. 2d at 1190.

In light of the evidence and Affidavits that the SEC has presented, which Defendants do not contest, the Court finds that the disgorgement amounts of $2,417,311.76 for Mulholland and $34,357.93 for Ritchie are "reasonable approximations" of each Defendant's ill-gotten gains. Mulholland and Ritchie are therefore liable to disgorge these amounts.

**B.   Prejudgment Interest**

**1.   Liability for Prejudgment Interest**

The SEC also contends that Mulholland and Ritchie are both liable for prejudgment interest on the disgorged amounts. Doc. 25, p. 14. Both Consent Judgments provide that, "[i]f disgorgement is ordered, Defendant *shall* pay prejudgment interest therein, calculated from September 30, 2008 . . . ." Docs. 18, p. 4; 24, p. 3 (emphasis added).

The Ninth Circuit has found that where Defendants have unlawfully received money from investors by distributing unregistered securities, they essentially received an "interest free loan" and should be liable for prejudgment interest. *Platforms Wireless*, 617 F.3d at 1099. "The purpose of ordering payment of prejudgment interest is to deny Defendants any possible profit resulting from illegal activity." *CMKM Diamonds*, 635 F. Supp. 2d at 1190. District courts in Nevada have acknowledged the force of consent decrees in foreclosing the ability of defendants to contest the imposition of prejudgment interest. *See id.* at 1189-91; *Security Exchange Commission v. Kaiser*, 2010 WL 2873019, at *1 (D. Nev. July 15, 2010).

---

[15]After proving that the disgorgement amount is a "reasonable approximation," the defendant has the opportunity to disprove the reasonableness of that assessment. *See Platforms Wireless*, 617 F.3d at 1096. In this case, Defendants have not filed any opposition to the SEC's Motion, so this element of the court's customary inquiry is not required.

9

The Court finds that prejudgment interest should be awarded against both Mulholland and Ritchie in this case.

### 2. Calculation of Prejudgment Interest

The SEC's updated motion seeks to calculate prejudgment interest amounts between October 1, 2008, and July 31, 2013, for both Defendants at the tax underpayment rate specified in 26 U.S.C. § 6621. *See* Docs. 25-3, pp. 7-8; 37-1, p. 1; 37-2, p. 1. The SEC has provided charts for Muhlholland and Ritchie to this effect, which list the applicable rate of interest mandated under the statute and apply it to the disgorgement amounts at issue. Docs. 37-1, 37-2. The SEC calculates that Mulholland should pay $459,723.34, and Ritchie should pay $6,534.20, in prejudgment interest. Docs. 37-1, 37-2.

When calculating the applicable interest rate, the Ninth Circuit has recently found that prejudgment interest in securities fraud cases should be calculated with reference to the Securities and Exchange Commission's position, which in turn uses of the tax-underpayment rate provided in 26 U.S.C. § 6621. *Platforms Wireless*, 617 F.3d at 1099 (citing 17 C.F.R. § 201.600, and noting that the statute is "a reasonable proxy for the interest rate that would ordinarily be charged on an unsecured loan.").[16] Section 6621 sets the underpayment rate as the sum of the Federal short-term rate, determined quarterly, plus 3 percentage points. *Id.* Therefore, the Court uses § 6621 to calculate the rate of interest pursuant to the chart that the SEC has submitted in support of its Motion.

The SEC fails to explain why it chose October 1, 2008, as the proposed start date for interest accrual. *See* Doc. 25, p. 15. However, the court's selection of a prejudgment interest accrual date is flexible. *See Platforms Wireless*, 617 F.3d at 1099-1100 (quoting *Securities and Exchange Commission v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996), and finding that trial court did not abuse its discretion when selecting as an accrual

---

[16]In contrast, 28 U.S.C. § 1961 is generally used to compute interest on money judgments in civil cases, and is used "unless the equities of a particular case demand a different rate." *In re Nucorp Energy, Inc.*, 902 F.2d 729, 734 (9th Cir. 1990). However, the *Platforms Wireless* court found that use of the lower treasury-bill interest rate in 28 U.S.C. § 1961 was inapposite because, *inter alia*, use of the lower rate would cause defendants to "benefit from their unlawful conduct by obtaining their . . . "loan" from investors at a below-market rate." *Id.*

10

date the date the securities were sold, even where the SEC was at fault for protracted litigation, as "defendants plainly had use of their unlawful profits for the entire period."). October 1, 2008, is sufficiently related to other relevant dates in this matter. The SEC's Complaint alleges that Mulholland began "dumping" his stock as early as May 2008, and then engaged in voluminous trading. *See* Doc. 1. On September 11, 2008, the pump-and-dump scheme ended when the SEC suspended all RUNU trading. Doc. 1, p. 21. The October 1, 2008, date, which occurs after the SEC ordered its suspension, is a reasonable period from which to calculate the total amount of prejudgment interest in a situation where accounting for each of the voluminous individual trades may be practically unworkable.

However, the SEC's actual calculation amounts in its original and supplemental motion conflict. For example, the calculations attached to the SEC's original motion begin on October 1, 2011, whereas those attached to the SEC's updated motion begin on November 1, 2011. Docs. 25-3, pp. 7-8; 37-2; 37-3. In the SEC's updated motion, it states that the accrual period should begin "on October 1, 2008." Doc. 37, p. 1. Therefore, it is reasonable to conclude that the "November 2011" interest calculation accrual dates included on the SEC's updated charts are typographical errors.

The practical effect of these errors is a divergence between the total prejudgment interest amounts requested in the SEC's original and updated motions. The SEC's interest calculations are based on a "period rate," which is a percentage of the adjusted annual rate. As the adjusted annual rate for the quarter was 6%, the "period rate" between October 1, 2008, and December 31, 2008, was 1.51%. Doc. 25-3, pp. 7-8. This resulted in a quarterly interest amount of $36,457.82 for Mulholland, and $518.19 for Ritchie. *See id.* In the SEC's updated motion, the "period rate" between November 1, 2008, and December 31, 2008, was adjusted from 1.51% to 1%, which resulted in a quarterly interest amount of $24,173.12 for Mulholland and $343.58 for Ritchie. *See* Docs. 37-2, 37-3. The error has a cascade effect through the remainder of the calculations because the quarterly interest is compounded.

The Court, having been provided with all rates, accrual dates, and base amounts, has *sua sponte* calculated the amount of prejudgment interest properly applied to both

Mulholland and Ritchie from the period between October 1, 2008, and July 31, 2013.[17] Thus, the Court awards prejudgment interest of $474,811.42 against Mulholland, and $9,461.87 against Ritchie. The Court also awards additional accrued interest against both Defendants in an amount calculated from August 1, 2013, through the date of entry of judgment pursuant to 26 U.S.C. § 6621.[18]

**C. Civil Penalty**

    **1. Liability for Civil Penalties**

The SEC also contends that Mulholland and Ritchie are liable for civil penalties in addition to disgorgement and prejudgment interest. Doc. 25, p. 15.

Under either the Securities Act, 15 U.S.C. § 77t(d)(1), or the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), "[w]henever it shall appear to the Commission that any person has violated any provision of this subchapter . . . the Commission may bring an action in a United States District Court . . . and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." *Id.*

The statutes both provide three tiers for determining the appropriate penalty. *See id.* at §§ 77t(d)(2); 78u(d)(3). In the first tier, penalties are imposed for "violations" of the statute, without more. *Id.* at §§ 77t(d)(2)(A); 78u(d)(3)(B)(i). The second tier covers securities violations that involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* at §§ 77t(d)(2)(B); 78u(d)(3)(B)(ii). Finally, third tier violations are second tier securities violations that also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* at §§ 77t(d)(2)(C); 78u(d)(3)(B)(iii).

---

[17]The Court began its calculation of the prejudgment interest amounts by multiplying the disgorgement amount by the periodic interest rate. For example, for Ritchie first quarterly period between October 1, 2008, and December 31, 2008, the Court multiplied 34,357.93 by 1.0151 to obtain a figure of 34876.734743. *See* Doc. 25-3, p. 8. Subsequently, to calculate Ritchie's figure for the period between January 1, 2009, and March 31, 2009, the Court multiplied 34876.734743 by 1.0123. *See id.* The total figure at the end of all periodic calculations was rounded to the nearest $0.50.

[18]Although it is highly probable that the last three-month period listed by the SEC ends on September 31, 2013, the Court declines to speculate as to the exact end date of the period.

12

### a.     Mulholland

In support of their Motion, the SEC contends that Mulholland played a "critical role" in the first round of the RUNU pump-and-dump scheme, as he engaged in fraud, deceit, and manipulation by writing and issuing false and misleading RUNU promotional materials. *Id.* at 16. These actions caused dramatic increases to RUNU stock value and the trading volume; ultimately, investors lost "at least" $2.4 million during the first round of the scheme. *Id.* at 17. Simultaneously, Mulholland was offloading his own stock "as fast as he could." *Id.* According to the SEC, these actions should subject Mulholland to a "significant" civil penalty. *Id.* at 16.

The Court has little difficulty concluding that Mulholland is liable for a third-tier penalty under the Securities Act and the Exchange Act. *See, e.g.*, *CMKM Diamonds*, 635 F. Supp. 2d at 1191-92 (finding that third-tier penalties were permissible for defendant who fraudulently and deceitfully sold stock which resulted in a defrauding of investors); *Securities and Exchange Commission v. Earthly Mineral Solutions, Inc.*, 2011 WL 1103349, at *4-*5 (D. Nev. Mar. 23, 2011) (finding third-tier civil penalties warranted where defendant fraudulently induced investors to lose $20 million in business venture).[19] Mulholland has failed to contest that (1) he made knowing misrepresentations about the RUNU stock with the intent that investors rely thereon, or that (2) investors lost "at least" $2.4 million as a direct result of Mulholland's actions. *See* Doc. 25, pp. 16-17.

### b.     Ritchie

The SEC contends that Ritchie is also liable for civil penalties. *Id.* at 18. The SEC admits that her violations were non-scienter based,[20] she was less involved in the scheme than Mulholland, and she "enjoyed a fraction of the profits Mulholland made from the scheme."

---

[19] The *Earthly Mineral Solutions* Court ultimately declined to impose third-tier sanctions due to the fact that no exact number had been provided that would allow the Court to calculate the appropriate civil penalties. *See id.* at *5.

[20] "Scienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. Securities and Exchange Commission*, 595 F.3d 1034, 1041 (9th Cir. 2010) (citation omitted). Establishing scienter requires a subjective inquiry into the defendant's state of mind. *See id.*

*Id.* at 18. Nevertheless, Ritchie should be held liable for civil penalties because she violated Section 5 of the Securities Act by offering and selling the unregistered RUNU stock, which was an abuse of her position as a securities professional. *Id.* The SEC also contends that Ritchie is a "recidivist" because she was previously found liable in a FINRA action for selling unregistered shares. *Id.*[21]

The Court finds that Ritchie is liable for a first-tier violation. Although she plainly violated the securities laws by facilitating the sale of unregistered securities, the SEC has made no showing that she took these actions with "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" as is required for tier two penalties. *Id.* Indeed, the SEC itself suggests that Ritchie may only be liable for $5,000 per violation, a tacit admission that it seeks imposition of a "tier one" penalty against her. *See id.* at 18. Therefore, the Court imposes "tier one" sanctions against Ritchie.

### 2. Calculation of Civil Penalties

Under both the Securities Act and the Exchange Act, "[t]he amount of penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2)(A); 78u(d)(3)(B)(i). The statutes provide that for tier one and tier three violations, the court may impose a penalty for each violation ($5,000 and $100,000 for natural persons, respectively), or alternatively impose "the gross amount of pecuniary gain to such defendant as a result of the violation." *Id.* at §§ 77t(d)(2)(A), (C); 78u(d)(3)(B)(i), (iii). *See also Securities and Exchange Commission v. Yuen*, 272 F. App'x 615, 618 (9th Cir. 2008) (permitting both disgorgement and civil penalties).

#### a. Mulholland

The SEC contends that Mulholland should pay a civil penalty equal to his gross pecuniary gain of $2,417,311.76 "because, in this complex microcap fraud case, it would be difficult for the Court to determine appropriate penalties on a per-violation basis." *Id.* at 16.

---

[21]"FINRA" stands for "Financial Industry Regulatory Authority." The enforcement action which the SEC references is entitled *Department of Enforcement v. Ritchie*, No. 2006005786501 (FINRA, Oct. 18, 2010), *available at* http://disciplinaryactions.finra.org/viewdocument.aspx?DocNB=13308 (last visited Sept. 10, 2013).

Courts calculate tier three penalties either by multiplying the defendant's violations by a dollar amount, or by imposing a flat penalty equal to the defendant's gross pecuniary gain. *CMKM Diamonds*, 635 F. Supp. 2d at 1192 (citation omitted). Courts also generally consider five additional factors: (1) the degree of scienter involved; (2) whether the infraction was recurrent in nature; (3) whether the defendant recognized the wrongful nature of the conduct; (4) the likelihood of future violations; and (5) the sincerity of the defendant's assurances against future violations. *Securities and Exchange Commission v. Murphy*, 636 F.2d 633, 654-56 (9th Cir. 1980); *CMKM Diamonds*, 635 F. Supp. 2d at 1192 (analyzing *Murphy* factors in analysis of civil penalties); *Securities and Exchange Commission v. Alpha Telecom, Inc.*, 187 F. Supp. 2d 1250, 1263 (D.Or. 2002) (same).[22]

Here, the number of transactions at issue makes imposition of a per-violation penalty both practically difficult and grossly disproportionate. The Court thus adopts the second approach in determining an adequate third-tier penalty against Mulholland. The Court finds that consideration of the *Murphy* factors suggests imposition of a substantial penalty. First, Mulholland's degree of scienter was high, as Mulholland was by all indications a sophisticated businessman who undertook principal responsibility for carrying out a deliberate and fraudulent scheme. Second, Mulholland's infractions were repeated, as he produced numerous promotional materials containing misrepresentations during the course of the scheme and sold his stock on an ongoing basis.

Analysis of the third, fourth, and fifth *Murphy* factors is confounded by Mulholland's failure to file any documents into the record. However, as to the third factor, Mulholland's consent to entry of the Consent Judgment does not convince the Court that Mulholland recognizes the wrongful nature of his conduct, as his Consent Judgment specifies only that he relinquished the opportunity to *contest* the SEC's allegations, but does not *admit* that any of them are true. As to the fourth factor, simply because an Order has been entered against Mulholland enjoining him from future violations of the securities laws, Doc. 6, there is no

---

[22]The *Murphy* factors were originally established in connection with imposition of injunctive relief, and did explicitly provide application to civil penalties. *See Murphy*, 626 F.2d at 654-55.

15

guarantee that future violations will not occur, given the complex and repeated nature of the violations made under the scheme. Finally, Mulholland has furnished the Court with no assurances that he will not commit future violations.

In light of the foregoing, the Court imposes a third-tier penalty against Mulholland equal to the amount of his disgorgement amount, which is $2,417,311.76.

### b. Ritchie

The SEC argues that Ritchie should pay a civil penalty of $40,000. *Id.* at 18. In support of this figure, the SEC claims that Ritchie executed 150 trades of RUNU stock, each of which might potentially carry a First Tier penalty of $5,000. *Id.* In lieu of a potential $750,000 penalty for her violations, the SEC suggests that a penalty of $40,000 is "proportional" to her illegal gains. *Id.* The SEC does not consider Ritchie's culpability for second or third tier penalties.

The statutory analysis for assessing first-tier violations is identical to that used for third-tier violations, although the Court has found no case in which the *Murphy* factors have been considered in connection with first-tier penalties. The SEC does not explain why, notwithstanding the fact that Ritchie has a lesser degree of culpability than Mulholland, she should be liable for a proportionally greater civil penalty, i.e., one greater than her disgorgement amount. The Court finds that in this case the SEC's request is unreasonable, and instead imposes a first-tier civil penalty against Ritchie equal to her disgorgement amount, which is $34,357.93.

## III.
## Conclusion

Accordingly, based upon the foregoing reasons, good cause appearing and no reason for delay,

It is **ORDERED** that the SEC's Motion for Entry of Final Judgments Determining Monetary Remedies as to Defendants Mulholland and Ritchie [Doc. 25] is **GRANTED** in part and **DENIED** in part, as stated in this Order.

It is **FURTHER ORDERED** that judgment is entered against Defendant Gregg. G.

Mulholland for (1) disgorgement of $2,417,311.76; (2) prejudgment interest thereon in the amount of $474,811.42, as well as additional accrued prejudgment interest in an amount calculated from August 1, 2013, through the date of entry of judgment as set forth in this Order; and (3) a civil penalty of $2,417,311.76.  The clerk shall enter judgment accordingly.

It is **FURTHER ORDERED** that Defendant Andrea Ritchie is liable for (1) disgorgement of $34,357.93; (2) prejudgment interest thereon in the amount of $9,461.87, as well as additional accrued prejudgment interest in an amount calculated from August 1, 2013, through the date of entry of judgment as set forth in this Order; and (3) a civil penalty of $34,357.93.  The clerk shall enter judgment accordingly.

DATED: September 24, 2013.

_____
JENNIFER A. DORSEY
UNITED STATES DISTRICT JUDGE