UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,  )<br>)<br>) | |
| Plaintiff,  ) | Case No. 2:11-CV-02011-JAD-VCF |
| )<br>v.  )<br>) | |
| ROCCO BRANDONISIO, JR., ET AL.,  )<br>) | |
| Defendants,  )<br>) | |

## DECLARATION OF CHRISTY WHITE

I, Christy J. White, declare as follows:

1. I am an Assistant Chief Litigation Counsel with the United States Securities and Exchange Commission, Division of Enforcement, Office of Collection, in Washington, DC, and I am personally familiar with the facts stated herein.

2. I am the attorney assigned to collection efforts on the judgment obtained against Defendant, Gregg R. Mulholland ("Mulholland" or "Defendant") on September 24, 2013 ("Final Judgment").[1] As of the date of this Declaration, Mulholland has not voluntarily paid any of the amounts due on the Judgment.

3. The Commission sent a Demand Letter to Mulholland at his then last known address on May 14, 2014. A true and correct copy is attached hereto as Exhibit 1. Upon information and belief Mulholland has since relocated to West Vancouver, Canada.

---

[1] Mulholland's judgment was bifurcated. A judgment was entered with his consent on January 19, 2012, which did not include the amounts of any disgorgement or civil penalty amounts ordered by the Court to be paid by Mulholland. The September 24, 2013 judgment identified the amounts Mulholland was ordered to pay.

4. In furtherance of collection efforts, the Commission also issued certain subpoenas to financial institutions and various third party service providers in an attempt to ascertain Mulholland's financial condition and ability to pay the Judgment. Through documents produced in connection with these subpoenas, the Commission determined that Mulholland had the ability to comply with the Court's Order.

5. In response to a subpoena issued by the Commission, American Express produced certain documents relating to a credit card account in Mulholland's name ending in x93008 ("Amex Credit Card"). True and correct copies of excerpts of the Amex Credit Card file are attached hereto and referenced in Paragraphs 15, 18, 19, 23, 26 and 57 below.

6. Attached hereto as Exhibit 2 is a summary detailing the post-judgment charges and payments to Mulholland's Amex Credit Card starting from August 28, 2013, and going through January 28, 2015. This Exhibit 2 is submitted pursuant to and in accordance with Rule 1006 of the Federal Rules of Civil Procedure. True and correct copies of the documents used to create this summary exhibit are available to Defendant and this Court at the Court's request and instruction.

7. Between November 5, 2010 and October 17, 2014, Mulholland used his Amex Credit Card to charge over $16,000 to Corporations Today, Wyoming Corporate Services, and VCorp Services, which specialize in providing one-day business formation services and selling shelf companies.[2]

8. Attached hereto as Exhibit 3 is a summary detailing expenses charged to the Amex Credit Card for aviation-related expenses from September 26, 2014 through January 21, 2015. This Exhibit 3 is submitted pursuant to and in accordance with Rule 1006 of the Federal

---

[2] Corporations Today and Wyoming Corporate Services have the same owner and operator. As a result, the two companies are used interchangeably when providing services to clients and for billing purposes, and they shall be referred to interchangeably herein.

Rules of Civil Procedure. True and correct copies of the documents used to create this summary exhibit are available to Defendant and this Court at the Court's request and instruction.

9. From September 26, 2014 to January 28, 2015, Mulholland spent approximately $162,438.90 in private jets and other aviation related expenses, an average of $40,609.73 per month, including:

- $81,699.92 to HBS Van Nuys Kvny;
- $23,400 to Simuflite Training;
- $13,571.04 to Air Service; and
- $7,893.24 to DVT Atlantic Deer VA. *See* Ex. 3.

## MULHOLLAND'S BUSINESS ENTITIES

10. Based, in part, on the production received from American Express, the Commission determined that Mulholland owned or controlled several business entities through which he received and paid out millions of dollars.

11. Upon information and belief Mulholland formed business entities including Black Foot Resources, Inc. ("Black Foot"), Stampeeder Systems, Inc. ("Stampeeder"), and Global Lead Gen, Inc. ("GLG"), DSC, Inc. ("DSC"), Vision Crest Consulting Group Limited, LLC ("Vision Crest"), Data Source, Inc. ("Data Source"), and Alpine International Aviation, LLC ("Alpine"), often using Wyoming Corporate Services. These shell companies served as Mulholland's alter egos ("Mulholland Companies").

12. In connection with subpoenas issued to Corporations Today and Wyoming Corporate Services, the Commission received documents for various transactions in which all but two of the abovementioned Mulholland Companies were formed and submitted subsequent

filings with the appropriate state agencies.  True and correct copies of excerpted documents from such production are attached hereto and referenced in paragraphs 15, 20 and 26.

**Global Lead Gen, Inc., f/k/a Stampeeder Systems, Inc.**

13. Stampeeder was initially registered to do business in Nevada on March 10, 2006; however, its registration has since been revoked. Mulholland was listed as an officer of Stampeeder on the Nevada Secretary of State website. A true and correct copy of Stampeeder's Filing Information from the Nevada Secretary of State is attached hereto as Exhibit 4.

14. In response to a subpoena issued by the Commission, Penson Financial Services provided certain documents relating to an account opened in the name of Stampeeder in 2006. Mulholland was also listed as the only officer or director of Stampeeder in the account opening documents. A true and correct copy of such documents is attached hereto as Exhibit 5.

15. On November 10, 2010, Stampeeder filed its Articles of Incorporation with the Wyoming Secretary of State. A true and correct copy of Stampeeder's Filing Information from the Wyoming Secretary of State Business Division's website is attached hereto as Exhibit 6. Stampeeder's date of incorporation was just five days after Mulholland's Amex Credit Card was charged $3,260 by Corporations Today. True and correct copies of Stampeeder's invoice from Wyoming Corporate Services and Mulholland's Amex Credit Card statement showing payment of the invoice are attached hereto as Exhibits 7 and 8 respectively.

16. Stampeeder was administratively dissolved in Wyoming on January 10, 2012. Shortly thereafter, on March 30, 2012, its status was changed from inactive to active, and on June 28, 2012, Stampeeder's name was changed to GLG, also a Wyoming corporation. *See* Exhibit 6.

17. Prior to these changes, Mulholland's Amex Credit Card was charged $1,210 by Wyoming Corporate Services for services rendered on behalf of GLG. On October 17, 2014, Mulholland's Amex Card was also charged $1,260 for services rendered to GLG. *See* Ex. 7.

18. According to the Wyoming Secretary of State website, Dale Paisley ("Paisley") is an officer or director for GLG. *See* Exhibit 6. Upon information and belief, Paisley is one of several straw men Mulholland uses to conceal his identity and finances.

**Data Source, Inc.**

19. On August 21, 2012, Mulholland's Amex Credit Card reflects a charge of $900 to Corporations Today. True and correct copies of Amex Credit Card statements that reflect payments related to Data Source are attached hereto as Exhibit 9.

20. Production from Corporations Today verifies that an order was processed to incorporate Data Source on August 21, 2012. True and correct copies of excerpted items from the Corporations Today production are attached hereto as Exhibit 10.

21. Data Source was incorporated in Wyoming on August 24, 2012. A true and correct copy of Data Source's Filing Information from the Wyoming Secretary of State Business Division's website is attached hereto as Exhibit 11. Mulholland and Paisley are listed as the initial directors; however, only Paisley is currently reflected on the Wyoming Secretary of State website.

22. Invoices for the renewal of various services from Wyoming Corporate Services were paid by Mulholland's Amex Credit Card on July 16, 2013 (for $135), and July 18, 2014 (for $287). *See* Ex.'s 9-10.

**Alpine International Aviation LLC**

23. On January 7, 2013, $16,960.72 was charged to Mulholland's Amex Credit Card by Kenneth C. Long, PC, Inc., ("KCL"). A true and correct copy of Mulholland's January 2013 Amex Credit Card statement is attached hereto as Exhibit 12. KCL is categorized as an establishment engaged in furnishing business and support services. True and correct copies of KCL's articles of incorporation and manta.com page are attached hereto as Exhibit 13. Upon information and belief, KCL retained Manley Law Group, PLLC, to draft and file Alpine's formation documents in Wyoming on February 27, 2013.

24. In response to a subpoena issued by the Commission, Manley Law Group, PLLC, produced the organizational documents drafted and filed on behalf of Alpine. True and correct copies of excerpted items from this production are attached hereto as Exhibit 14. Kenneth C. Long ("Long") is identified as the member and manager of Alpine.[3]

25. According to the Wyoming Secretary of State, Alpine's filing status with the state has been "Inactive – Administratively Dissolved (Tax)" since April 11, 2014. A true and correct copy of Alpine's Filing Information from the Wyoming Secretary of State Business Division's website is attached hereto as Exhibit 15.

26. Eleven days prior to Alpine's dissolution, Mulholland's Amex Credit Card was charged $237 by Wyoming Corporate Services for services rendered on behalf of Alpine. True and correct copies of the March 31, 2014 invoice and Mulholland's Amex Credit Card statement are attached hereto as Exhibits 16 and 17.

---

[3] Long is also the principal at KCL.

## FINANCIAL INSTITUTIONS THROUGH WHICH MULHOLLAND AND HIS ENTITIES OPERATE

**Security First Bank**

27.     In response to a subpoena issued by the Commission, Security First Bank ("Security First") produced certain documents relating to a checking account in Data Source's name ending in x5412 ("Data Source SF Account").  Mulholland and Paisley were the owners of this account.[4]  They indicated that its normal activity would involve large wire transfers.  A true and correct copy of the opening documents for the Data Source SF Account is attached hereto as Exhibit 18.

28.     The Data Source SF Account was initially funded by a February 1, 2013 bank check in the amount of $49,422.60 that was issued with funds from a Data Source bank account at Capital Bank.  The funds for that bank check were transferred from an account in the name of Retail Source 1 Corporation.  A true and correct copy of the initial deposit is attached hereto as Exhibit 19.

29.     Attached hereto as Exhibit 20 is a summary detailing the cash flows of the Data Source SF Account.  Included therein is a listing of post-judgment debits and credits from February 2013 through March 2015.  This Exhibit 20 is submitted pursuant to and in accordance with Rule 1006 of the Federal Rules of Civil Procedure.  True and correct copies of the documents used to create this summary exhibit are available to Defendant and this Court at the Court's request and instruction.

30.     Since the January 19, 2010 judgment was entered, the Data Source SF Account received wires in excess of $2,000,000.  *See* Exhibit 20.

---

[4] In 2015, after receiving and responding to the Commission's subpoena and garnishments, Security First unilaterally decided to close all accounts associated with Mulholland and Paisley, including the Data Source and Alpine accounts.

31. Several large interbank transfers were also received from a Security First account in the name of GLG. The authorized signatory to this account was also Paisley.

32. Outgoing wire transfers in excess of $1.8 million were made to accounts tied to Mulholland from February 2013 through March 15, including:

- $959,325.68 to Mulholland's personal bank account at Capital Bank;[5]
- $250,000 to Arsenal Venture Group, LLC;
- $350,000 to Panorama Investment Group, LLC;
- $215,199.91 to Black Foot; and
- $100,000 to Vision Crest. *See* Exhibit 20.

33. Wires in the total amount of $894,000 were sent from the Data Source SF Account to Mulholland's Joint Capital Bank account ending in x3340. These wires were approved and signed for by Paisley. In connection with a subpoena issued to Capital Bank, the Commission received documents relating to Mulholland's personal and business accounts. A true and correct copy of the wire activity from the Data Source SF Account to Mulholland's personal account is attached hereto as Exhibit 21.

34. Dating back to November 20, 2013, the Data Source SF Account was also used to pay Mulholland's Amex Credit Card bills. As of February 6, 2015, payments made from the Data Source SF Account to Mulholland's Amex Credit Card totaled $1,094,819.68. A true and correct copy of a listing of payments received by American Express from the Data Source SF Account is attached hereto as Exhibit 22.

35. Another checking account in the name of GLG was opened by Paisley on February 7, 2013. In response to a subpoena issued by the Commission, Security First produced

---

[5] This amount also includes checks made payable to Mulholland.

certain documents relating to the GLG account ending in x3616 ("GLG SF Account"). A true and correct copy of excerpts of the GLG SF Account file is attached hereto as Exhibit 23.

36. A GLG SF Account check dated April 15, 2015, paid $35,000 to the United States Treasury. The memo on the check refers to a 2014 Form 1040 extension and a social security number matching Mulholland's. Another GLG SF Account check on the same date paid the California Treasury $5,000 for a similar extension related to Mulholland's social security number. *See* Ex. 23.

37. Attached hereto as Exhibit 24 is a summary detailing the cash flows of the GLG SF Account. Included therein is a listing of post-judgment debits and credits. This Exhibit 24 is submitted pursuant to and in accordance with Rule 1006 of the Federal Rules of Civil Procedure. True and correct copies of the documents used to create this summary exhibit are available to Defendant and this Court at the Court's request and instruction.

38. Between March 12, 2013 and July 30, 2015 (when the account was closed), the GLG SF Account transferred more than $2.1 million to Mulholland Companies including: DSC, Data Source, and Alpine. *See* Ex. 22. Over $185,000 was transferred to one of Mulholland's straw men, Long. *See id.*

39. Mulholland also had a Security First account for Alpine, which was opened by Paisley in November of 2013. In response to a subpoena issued by the Commission, Security First produced certain documents relating to a checking account in Alpine's name ending in x5918 ("Alpine SF Account"). A true and correct copy of excerpts of the Alpine SF Account file is attached hereto as Exhibit 25.

40. Like most of the Mulholland Companies, Paisley served as the straw man for Alpine's operations. He opened Alpine's Security First account and was listed as its sole owner. *See* Ex. 25.

41. The Alpine SF Account was initially funded by two transfers totaling $45,000 from the GLG SF Account. On the date of the second transfer, December 16, 2013, $43,787.96 was wired from the Alpine SF Account to an Alpine account ending in x7151 located at Colorado State Bank and Trust. *See* Ex. 25, p. 6-7. The beneficiary of the December 16 wire was KCL.

42. Several transfers occurred between the Alpine SF Account and the Data Source SF Account. In less than 2 months $37,000 was transferred from the Alpine SF Account to the Data Source SF Account. During the same time period $6,000 was transferred from the Data Source SF Account to the Alpine SF Account, and an additional $30,000 was transferred from the GLG SF Account to the Alpine SF Account.

**Capital Bank**

43. In response to a subpoena issued by the Commission, Capital Bank produced documents relating to checking accounts for GLG ending in x2736 ("GLG Capital Account"), and Data Source ending in x2744 ("Data Source Capital Account") (collectively "Capital Bank Accounts"). Similar to the Security First accounts for Data Source and Alpine, Paisley was the owner and signatory for both Capital Bank Accounts. Mulholland was the co-owner and signatory to the Data Source Capital Account. True and correct copies of excerpts from the GLG Capital Account and Data Source Capital Account files are attached hereto as Exhibits 26 and 27 respectively.

44. The GLG and Data Source Capital Accounts were opened on August 30, 2012. According to documents filed with Capital Bank, the Capital Accounts would be receiving domestic wires as well as wires from Canada and Scotland. *See* Exhibits 26 and 27.

45. In addition to the Data Source Capital Account, Mulholland was also a co-owner and signatory to a Capital Bank joint checking account with his wife, Delia Mulholland, which ended in x3340 ("Joint Capital Account"). This account was funded primarily with wires from the Data Source SF Account. *See* Exhibit 22. True and correct copies of excerpted documents regarding the Joint Capital Account are attached hereto as Exhibit 28.

46. On November 25, 2013, Paisley was authorized to have access to the Joint Capital Account by Mulholland.

47. Between April 4, 2013 and May 1, 2015, Paisley and/or Data Source transferred over $890,000 to the Joint Capital Account. *See* Ex. 21.

## MULHOLLAND'S PRIVATE JET

48. In response to a subpoena issued to Sotheby's International Realty, the Commission received a copy of the file relating to the sale of Mulholland's primary residence located at 30302 Malaspina Road, San Juan Capistrano, CA 92675 ("Malaspina Property").[6] A copy of correspondence from Mulholland was included therein, which provided the purchaser with a list of recommended vendors in the surrounding area. Among the vendors on the list was Robert Salvo ("Salvo"), who is the principal at FUGA, Inc. ("FUGA"), an air charter operator. Mulholland explained that through Salvo and FUGA, the purchasers could rent a "9-seat Falcon 50" private jet for $3,850 per hour. A true and correct copy of correspondence from Mulholland regarding the private jet rental is attached hereto as Exhibit 29.

---

[6] The Malaspina Property was owned by Mulholland's alter ego, Vision Crest. *See* ECF No. 92.

11

**N868BT Dassault-Breguet Falcon 50**

49. In connection with a subpoena issued to FUGA, the Commission received documents related to the 9-seat Falcon 50 referred to by Mulholland in the abovementioned preferred vendor list. True and correct copies of excerpts of this production are attached hereto as Exhibit 30.

50. In the FUGA production, and in subsequent communications with the company, Mulholland was identified as the owner of a Dassault-Breguet Falcon 50 with the United States Registration Number: N868BT ("Falcon 50").

51. In connection with a subpoena issued to International Aircraft Title ("IAT"), the Commission received documents relating to Mulholland's Falcon 50. True and correct copies of excerpts of this production are attached hereto as Exhibit 31.

52. Like the assets owned by other Mulholland Companies, Mulholland's Falcon 50 was acquired through his alter ego, Alpine, using straw man, Long. *See* ¶ 24. On March 20, 2013, Alpine purchased the Falcon 50 for $2,530,000.

53. Payment for the Falcon 50 was transferred from an offshore account in the name of Kensington Legal Associates, which also transferred large sums of money to Mulholland's company Vision Crest.

54. According to documents initially filed with the Federal Aviation Administration ("FAA"), Alpine's sole member/manager was Long. *See* Ex. 31. However, the documents were amended on October 22, 2013, naming GLG as the sole manager and member of Alpine, and Paisley as GLG's president. A true and correct copy of Alpine's amended Statement in Support of Registration of a United States Civil Aircraft is attached hereto as Exhibit 32.

55. Between September 26, 2014 and January 21, 2015, a time period of less than four months, Mulholland charged more than $160,000 to his Amex Credit Card for aviation-related expenses. *See* Ex. 3.

56. The abovementioned Amex Credit Card charges correspond with various flight plan records registered with the Air and Marine Operations Center ("AMOC") of the U.S. Customs and Border Protection agency. A true and correct copy of an excerpt of AMOC's summary of Mulholland's Falcon 50's flight plan records is attached hereto as Exhibit 33.

57. One such Falcon 50 flight plan was disclosed by FUGA, which confirmed one family trip chartered by Mulholland to Vancouver on December 9, 2014. The fees incurred with this flight match Mulholland's Amex Credit Card statement for December 2014, which references aviation-related expenses and various charges originating in Canada. A true and correct copy of Mulholland's Amex Credit Card statement showing charges that correspond to Mulholland's family trip to Vancouver are attached hereto as Exhibit 34.

**Falcon 50 Lease Agreement with FUGA Inc.**

58. In connection with a subpoena issued to FUGA, the Commission also received documents relating to FUGA's Aircraft Charter Lease Agreement ("Lease Agreement") with Alpine. *See* Ex. 30. Pursuant to the Lease Agreement, FUGA operates Mulholland's Falcon 50 and provides other services including chartering the Falcon 50 out to the general public for a fee.

59. Between November 6, 2014 and March 20, 2015, FUGA transferred at least $251,766.58 to the Alpine SF Account in connection with the Lease Agreement. *See* Ex. 30 p. 45. A majority of the funds received by the Alpine SF Account from FUGA was subsequently transferred to the GLG SF Account or another Security First account in the name of DSC. *See* ¶ 42.

60. Since then, according to FUGA, Mulholland's Falcon 50 has not generated any revenue through its charter flights. FUGA plans to sell Mulholland's Falcon 50 in the near future.

I declare under penalty of perjury pursuant to the provisions of 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 11th day of December, 2015, in Washington, District of Columbia

/s/ Christy J. White
Christy J. White
Assistant Chief Litigation Counsel
United States Securities and Exchange Commission